CONSOLIDATED WYOMING GOLD MIN. CO. v. CHAMPION MIN. CO.

(Circuit Court, N. D. California. August 13, 1894.)

1. MINING VEINS.
   To constitute a vein it is not necessary that there be a clean fissure, filled with mineral, as it may exist when filled in places with other matter, but the fissure must have form, and be well-defined, with hanging and foot walls.

2. SAME—UNION OF VEINS—EVIDENCE.
   On the question of whether two veins unite in disputed ground it may be shown that their directions outside of as well as within the disputed ground are such that, if continuous, they would meet.

3. SAME—EXTRALATERAL RIGHTS.
   Where a vein enters an end line of a claim, and continues nearly parallel with the side lines for the greater part of the length of the claim, the owner of the claim is not deprived of the extralateral rights attached to the vein, under St. 1872 (Rev. St. § 2322), because the vein crosses a side line before reaching the other end line, but his extralateral rights will extend from the end at which the vein enters to the point at which it crosses the side line.

4. SAME—BURDEN OF PROOF.
   Under St. 1872 (Rev. St. § 2322), giving a locator the right to all veins throughout their entire depth, the apexes of which lie within the surface lines of his claim, though in their course downward they extend outside

the vertical side lines of the claim. a locator cannot take mineral from the claim of another without showing by a preponderance of evidence that it is part of a vein having its apex in his own claim.

**5. SAME—LOCATION OF VEIN—PATENT.**

Extralateral rights of a locator are determined by the actual location of a vein, and not its location as marked on the patent of a claim.

**6. INJUNCTION—ACCOUNTING.**

In case of trespass on a mining claim it is not necessary to bring separate actions for injunction and an accounting, but both may be had in the same suit.

Action by the Consolidated Wyoming Gold Mining Company against the Champion Mining Company. Decree for complainant.

John M. Wright and W. S. Wood, for complainant.

Edward Lynch and Lindley & Eickhoff, for respondent.

HAWLEY, District Judge. This is an action of trespass, with a prayer for equitable relief, for an accounting, and an injunction. It was commenced in the superior court of Nevada county, and removed to this court by respondent, upon the ground that it involved a construction of the United States statutes relating to mining claims.

1. A motion was made by complainant to remand the cause to the state court upon the ground that there was a prior judgment in the state court between the same parties, which left no issue to be litigated except the fact and extent of the trespass, and that no federal question was involved. This motion was denied, and a plea in abatement to the jurisdiction of this court was overruled by the circuit judge. Complainant is the owner of the Wyoming and Ural quartz lodes and mines, for each of which it has a United States patent. The patent for the Wyoming lode was issued September 19, 1874, and is based upon a location or occupancy of the lode claim prior to 1872. The patent recites the fact that it is granted under the law of 1866, and the acts amendatory thereof of 1870 and 1872. It grants 2,270.40 linear feet of the Wyoming lode and certain surface ground, which is particularly defined by metes and bounds. The patent to the Ural lode for 2,000 linear feet and the surface ground was issued May 12, 1880. It recites the fact that it is issued under certain sections of the Revised Statutes of the United States, which includes the statutes of 1866, 1870, and 1872. Both of said patents contain a grant of the mining premises substantially in the language of section 2322, Rev. St. U. S. The respondent is the owner of the New Year's and New Year's Extension, upon which it particularly relies, and of the Climax and certain other claims, which need not be specifically mentioned, and its title thereto is evidenced by a certificate of purchase from the United States land office, which is admitted to be equivalent to a patent from the government. The title of complainant to its Wyoming and Ural claims is prior in point of time to that of the respondent to its claims. There is no dispute whatever as to the surface lines of the respective claims. It is admitted by complainant that whatever its rights to the Wyoming

and Ural lodes were prior to its application for a patent, when it had these claims surveyed by the United States surveyor, and permitted him to draw the end lines, it is estopped, under its patent, from any further claim outside of the lines that were fixed by the surveyor, and that its extralateral rights—which constitute the principal bone of contention in this case—are confined to planes drawn downward through the end lines of the survey, and extended indefinitely, and that at a certain depth these end-line planes would come together, and its extralateral rights would be entirely cut off. The former judgment in the state court was rendered in an action brought by the Champion Gold Mining Company (respondent in this action) against the Consolidated Wyoming Company (complainant here). The trespass there alleged was upon the Philip ground belonging to the Champion,—which is not here involved,—but the Champion in that action set up its title to the Philip, Champion, Climax, New Year's, New Year's Extension, and the Annex mining claims, and included the ground in controversy in this action. The question of end lines was there in issue, and the court found that a certain course described in the pleadings was the course of the southern end line of the Ural quartz mine. The question of the junction of the Wyoming and Ural lodes was also presented. The judgment in that case reads as follows:

"Now, therefore, it is considered, adjudged, and decreed that plaintiff have judgment against the defendant for the sum of one hundred and twenty dollars, with its costs therein expended up to the time of filing of the answer to the amended complaint; that plaintiff is not entitled to any injunction or other relief against defendant; that defendant is entitled to work its Wyoming mine along and all points below the junction thereof with the Philip mine of plaintiff, and that it is entitled to work both its Wyoming and Ural mines at any point below where either of said mines, on its dip, may unite with the New Year's or Climax or New Year's Extension or Annex mines of the plaintiff; and that defendant have and recover its costs herein expended since the filing of its said answer to amended complaint."

An appeal was taken to the supreme court, and the judgment was affirmed. Champion Min. Co. v. Consolidated Wyoming Gold Min. Co., 75 Cal. 78, 16 Pac. 513. The admissibility of this judgment as evidence was passed upon by the circuit judge in deciding that this court had jurisdiction of this case, and these questions will not be reviewed.

The following diagram shows the surface boundaries of the respective claims and the lode lines of the respective lodes as defined and represented in the patents, and contains the stipulation of the parties in regard thereto, and with reference to the former judgment between the same parties in the state court. [See Diagram A.]

The lode lines represented on this diagram are ideal, as distinguished from the actual lines of the lodes as shown by the testimony. The line of outcroppings of the Wyoming and Ural lodes, with the underground workings of the Wyoming and Champion companies, are shown upon the following diagram. [See Diagram B.]

In the Circuit Court of the United States, Ninth Circuit, Northern District of California.

Consolidated Wyoming Gold Mining Company, a Corporation, Complainant,

vs.

Champion Mining Company, Respondent.

It is hereby stipulated by and on the part of the above-named complainant and respondent, respectively, for all the purposes of this suit: First, that this map shall be held and taken to correctly represent the situs, surface boundary lines, and relative situation of the Wyoming and Ural mines, claimed by complainant, and the New Years Extension, New Years, Climax, Champion Patent, Mill Site, Muller (or Ural Extension), Phillip, and Merrifield (or Nevada) mines, claimed by respondent; second, that said Wyoming and Ural mines are the same Wyoming and Ural mines named as part of the property claimed by said Consolidated Wyoming Gold Mining Company as defendant, and said Ural Extension (or Muller), Phillip, Champion Patent, Climax, New Years and New Years Extension mines are the same Ural Extension (or Muller), Phillip, Champion Patent, Climax, New Years and New Years Extension mines named as part of the property claimed by said Champion Mining Company, as plaintiff, in the judgment roll and findings in that certain action lately pending in the —— superior court of Nevada county, state of California, wherein said Champion Mining Company (respondent here) was plaintiff, and the Consolidated Wyoming Gold Mining Company (complainant here) was defendant, being cause No. 12,085, wherein the judgment was entered April 21, 1886. Defendant, however, reserves all objections to the relevancy and admissibility of said judgment.

W. S. WOOD,
JOHN M. WRIGHT,
Solicitors for Complainant.
LINDLEY & EICKHOFF,
Attorneys and Solicitors for Respondent.

# DIAGRAM B.

·The outcrop of the respective lodes upon the surface is not continous nor well-defined, but it has been exposed in a sufficient number of places to show—when taken in connection with the underground workings—that the general course of the croppings as delineated on the diagram is substantially correct. The apex of the Wyoming lode is clearly established within the surface boundaries of the Wyoming claim, and the lode extends throughout the entire length of said claim through the northern and southern end lines thereof. The apex of the Ural is shown to be in the Ural claim, and the lode extends from the northerly end line through the claim in a southerly direction for about 1,400 feet, and then crosses the eastern side line of the Ural as delineated on the diagram, at a point about 600 feet from the southerly end line of the Ural surface location. The walls of the Wyoming lode are both slate, and in the testimony the Wyoming is called the "slate" vein. The Ural lode has a hanging wall of granite or diorite, and the foot wall is slate, and this is called the "contact" vein. The slate vein extends downward into the earth at an angle of about 25 degrees to the southeast. The contact vein extends downward in the same general direction at an angle of about 35 degrees.

There are numerous controverted questions of fact, as well as of law, that will have to be solved in order to determine the rights of the respective parties.

2. Before discussing any of the controverted, conflicting, and somewhat complicated questions of fact, it is proper to say that both parties had several large maps carefully drawn, and prepared in such a manner as to materially aid them in presenting the testimony of the respective witnesses in a clear and concise manner. Each party also introduced a large model of the underground workings, by reference to which the court was able to follow the witnesses as they gave their testimony concerning their examination of the several drifts, tunnels, upraises, winzes, and levels exposed in the underground workings of the respective claims. The testimony was presented, and the whole case tried, in an intelligent and satisfactory manner. Counsel were fair and courteous to the court, to the witnesses, and to each other. Questions not in real dispute were readily admitted. Each party pursued a similar line of examination by introducing first their surveyors; second, the superintendent or underground foreman; third, practical and experienced miners; and, fourth, one expert on each side. The witnesses were intelligent men, and favorably impressed the court that they intended to tell the truth, and detail the facts as they appeared to them, without any hesitation or equivocation. Both counsel and witnesses demeaned themselves throughout the long and tedious trial in such a manner as to receive the commendation of the court for their honesty, frankness, ability, and courtesy. The case was tried with extreme caution, so as to cover every possible phase that might be taken of the numerous questions involved. The result is that many of the questions raised and much of the testimony taken became unimportant in the light of the conclusions reached by the court. It is not deemed necessary to enter into any extended statement of the facts. The record is large, perfect, and complete.

The various links in the chain of evidence are too numerous to warrant any minute attempt to show how they are welded together.

3. The principal contention upon the part of the complainant is that the Wyoming or slate vein and the Ural or contact vein, in their downward course from the surface, unite and form a junction, and that from the point of junction downward there is but one lode or vein, and that is a contact vein between granite and slate walls. The contention of respondent relative to this question is that there is a middle vein between the 300 and 400 foot levels from the Champion shaft, which is a separate and wholly independent vein, in a different fold of slate from the Wyoming lode, which has its apex within the lines of respondent's claims; that the Wyoming lode or slate vein does not unite with, intersect, or touch the contact vein.

From the impressions received at the trial, and from a careful review and examination of the testimony, as it appears in the record, my conclusion is that the union of the Wyoming and Ural lodes is clearly established by the weight of the evidence as contended for by the complainant. In this connection some general views will be given as to what constitutes a lode or vein. In Book v. Mining Co., 58 Fed. 121, I stated that the statute upon this subject "was intended to be liberal and broad enough to apply to any kind of a lode or vein of quartz or other rock bearing mineral, in whatever kind or character of formation the mineral might be found. It should be so construed as to protect locators of mining claims who have discovered rock in place, bearing any of the precious metals named therein, sufficient to justify the locators in expending their time and money in prospecting and developing the ground located." The character of the formation in which the veins and lodes are found in the ground in controversy is entirely different from that which was found to exist in Book v. Mining Co., but the quotation therefrom is as applicable to fissure veins as it is to the mineralized zones. In defining lodes and veins the text-books and several of the decisions speak of them as fissures in the earth, filled with quartz in place, carrying gold and silver or other minerals. But true fissure veins and lodes often exist and are continuous without having any filling in certain points or places of mineral matter. A majority of such lodes have, in addition to the clean fissure filling of mineral, a considerable amount of decomposed wall rock, clay, etc. In slate formations, as was said by Prof. Brown in giving his testimony in this case, it frequently occurs that one of the walls has been subjected to a certain amount of fracture, which results in the formation of a number of seams, and in the decomposition of the material included between the seams of unaffected wall rock, which miners designate as "horses." To constitute a vein it is not absolutely necessary that there should be a clean fissure filled with mineral, but it may and does exist when filled in places with other matter. The fissure should, of course, have form and be well defined, with hanging and foot walls. Between these walls will be found bodies of quartz, rich or poor, but there is also liable to be found in many places short or long distances between the quartz bodies or pay chutes where no

quartz will be found in the fissure between the walls. Yet the vein exists, and is often as well defined as if the same was filled with quartz. The clay, the selvages, slickensides, striation, and ribbing of the walls are frequently as strong evidence of the indication of permanency and continuity as the existence of the quartz itself. Under this definition the existence and continuity of the slate and contact veins were proven to exist in length and depth throughout the various underground workings by evidence of a convincing character.

During the trial respondent objected to any testimony being given as to the condition or existence of the lodes upon the surface or in the underground workings in the northern portions of the ground, as only the southern portion was really in dispute. I am of opinion that this testimony was admissible—although, in the light of the former judgment, and of other features in the case, perhaps unnecessary—as bearing more or less directly upon the question of the union of the two veins in the southern part. It was shown that the complainant's witnesses, in tracing the slate vein downward in the southerly part of the claim, where nearly all of the contests between the parties exist, followed the foot wall of said vein through divers tunnels, inclines, etc., bringing them directly to the contact vein, where, as they testify, there was a distinct union of the lodes, the quartz of the slate vein in some places, that were closely examined, entering and joining with the quartz of the contact vein. This condition of affairs is not only found to exist in the southern part, specially in conflict, by the weight of evidence, but it is shown by undisputed testimony to have existed at several points in the middle and northern portions of the ground where the ore in the veins has been extracted. The established line of croppings extending through the northern, middle, and a portion of the southern part of the ground, running as they do in substantially the same general direction, and descending into the earth at the different angles specified, shows clearly that, if both lodes are continuous, they would naturally come together, because you cannot have two separate lodes of ore or vein matter going into the earth at the angles and in the manner shown to exist here without their coming together, if both are continuous. Then, again, there are two branches or separate lodes or veins of ore—one in slate, the other in contact—above the point of junction, and there is but one vein below that point. Without entering into the field of geological science as to the formation of veins and the filling of the cracks or fissures in the earth, it is evident that all the fissures in the ground in controversy were filled, as Prof. Janin states, at the same period of time, by the same force of nature, whether filled from above or laterally or came up from below. All of these facts tend more or less to sustain and strengthen the positive testimony of complainant's witnesses that there is a union of the two lodes. It will be observed that this conclusion is reached independent of any question as to the extent and effect of the former judgment. It is therefore unnecessary to discuss the question upon which respondent relied, and in regard to which numerous authorities were cited, whether respondent, by its certi-

ficate of purchase from the government, had' obtained a subsequently acquired title that could be set up against the judgment. Respondent contends that, if it should be established by the evidence, to the satisfaction of the court, that the slate vein unites with the contact, yet it is a union on the strike, and not upon the dip. Upon this question there is also a conflict of evidence, the weight of which establishes the fact to be that the line of the union is irregular. It cannot accurately be said that there is a union on the strike only, or a union on the dip only. The line of union varies at different places. The union at the north and south ends of the ground is found at a greater depth than in the middle part. The fact is that the union is partly on the strike and partly on the dip. The weight of the testimony touching 'this point establishes the fact that the union: is more upon the dip than upon the strike.

The views already expressed are conclusive upon the point that complainant, by virtue of its ownership of the slate vein in the Wyoming, is entitled to an injunction to prevent respondent from working northerly of a line drawn downward vertically with the southerly end line of the Wyoming claim. If no other portion of the ground was in controversy, the decision of the case might be safely rested here without any discussion of the many other questions presented at the trial, because the laws of the United States provide that, "where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection." Rev. St. U. S. § 2336. This provision is held not to be in conflict with the provisions of section 2322. Wilhelm v. Silvester (Cal.) 35 Pac. 997; Mining Co. v. Leach (Ariz.) 33 Pac. 418. Complainant would, therefore, take the ground to the full extent stated,—that is, between the end-line bounding planes of the Wyoming claim extended in their downward course,—independent of any rights it may have by virtue of its patent to the Ural lode and surface location.

4. What are the rights of the complainant under the Ural location and patent? Respondent's counsel claim that no extralateral rights attached to the contact vein, because it crossed the easterly side line of the surface location of the Ural claim before reaching the southerly end line of the location. This point was not seriously urged, but it was intimated and suggested that the opinion of the supreme court in King v. Amy & Silversmith Min. Co., 152 U. S. 222, 14 Sup. Ct. 510, is susceptible of that construction. If that case is not fairly susceptible of such a construction, then it is, of course, conceded that Tyler Min. Co. v. Sweeney, 4 C. C. A. 329, 54 Fed. 284, and Last Chance Min. Co. v. Tyler Min. Co., 61 Fed. 557,[1] are conclusive in favor of complainant's right to all that portion of the Ural lode the apex of which is within the surface ground of the Ural survey and location. I am of opinion that the decision of the supreme court of the United States is not in conflict with the Tyler Cases decided in the court of appeals for this circuit. It is a universal rule of construction that the decisions of courts are to be in-

[1] 9 C. C. A. 613.

terpreted with reference to the facts in each particular case. In the Amy Case the court held that the side lines of the claim constituted the end lines of the location. Why? Because "the lines marked as side lines cross the course of the strike of the vein, and do not run parallel with it." It would be a contortion of the facts and of the law to construe the principles announced in the Amy Case as applicable to a location like the Ural, where the lode, as located by the surface claim, crosses through the northerly end line, and runs nearly parallel with the side lines for a distance of about 1,400 feet, when it changes its course, and crosses the easterly side line of the surface location about 600 feet north of the southerly end line of the location. It cannot, it seems to me, consistently be said that complainant is deprived of any of its extralateral rights to the 1,400 feet, more or less, which is all entirely within the surface lines of the Ural patent, and substantially parallel with its side lines as marked upon the surface ground. The statute of the United States is not, in my opinion, susceptible of any such construction, and no decision of any national or state court has ever gone to that extent. The supreme court of the United States in the Amy Case simply decided that when a mining claim is located across, instead of along, the lode, its side lines must be treated as its end lines, and its end lines as its side lines; so that, under Rev. St. § 2322, the dip cannot be followed outside the vertical plane of the original side lines into an adjoining claim. There is nothing in either of the opinions of the circuit court of appeals in the Tyler Cases which is at variance with this principle. On the contrary, this rule is expressly recognized. But it is true that there is an expression in the Tyler Cases to the effect that the question whether the lode crosses the side lines more nearly at right angles than along the course of the side lines should always be considered. This particular position, which is deemed sound and just, was not discussed in the Amy Case, and was not, perhaps, involved in that decision. One illustration will be sufficient to show the justice of the position as stated in the Tyler Cases, although that particular question is not here involved: Let us suppose that a location is made under the act of 1872, in the form af a parallelogram 1,500 feet in length and 600 feet in width; that the lode enters one of the side lines within 5 feet of one of the end lines of the location; that it then continues upon its strike, nearly parallel with the side lines, until it comes within 5 feet of the other end line, and then changes its course so as to cross the other side line. This lode does not pass through either end line, yet, under the rule announced in the Tyler Cases, the locator would be entitled to 1,490 feet lengthwise upon the lode, and to follow it for that distance upon its dip vertically downward, as expressed in the statute. I am of opinion that in such cases the statute is definite enough and clear enough to make the end lines parallel at the point of the entrance and of the departure of the lode across the side lines, and to draw them crosswise of the general course of the lode within the limits of the surface location, and that this should always be done so as to give to the locator just what the statute evidently intended he should have, instead of depriving him of all extralateral rights because, by some mistake or

oversight in marking his lines, or by lack of judgment or knowledge as to where the lode ran, he had failed to get his lines exactly parallel with the lode, and had marked his end lines at a point beyond where the lode was found to exist upon its strike within the surface lines of his location. But, be that as it may, the Amy Case does not go to the extent of deciding that if the lode passes through one end line, and in its entire course is nearly parallel with the side line, which it crosses before reaching the other end line, the locator would be deprived of all his extralateral rights. In a majority of cases where mining locations are made in the form of a parallelogram under the act of 1872, the lode or vein located does not run lengthwise directly parallel with the side lines of the location. The statute is based upon ideal locations of parallelism that seldom, if ever, exist. It is in fact almost impossible to make a perfect surface location, the side lines of which would be absolutely parallel with the lode, or the end lines precisely at right angles with the strike of the lode, no matter what length of time is taken before marking the surface boundaries of the location. If the locator makes his location crosswise instead of lengthwise of the lode, then the end lines of the location become side lines, and he can only take so much of the lode lengthwise as lies within the surface lines of his location. But if the lode runs like the contact vein does through the Ural surface ground, there is no substantial reason that would justify a court in declaring that the locator would not be entitled to any extralateral rights. No such construction has ever been given to the statute. There is but little, if any, force in the suggestion often made that the locator should postpone the marking of his boundaries until sufficient explorations are made to ascertain the "true course and direction of the vein." The present case furnishes a fair example of the difficulties so often encountered by the miner in his efforts to determine the direction of the vein he has discovered.

The Wyoming vein has been located, and at different times worked upon, during the past 40 years, and it is still a disputed and closely contested question as to where the lode actually runs; and, in addition to all the regular workings of the mine, it has required the expenditure of money, time, and labor in order to enable the witnesses to testify with any degree of certainty to the "true course and direction of the vein." Every practical miner knows the difficulty that is often experienced in ascertaining these facts. The truth is that the miner is often compelled by the law to make his lines of location upon the surface ground before such facts can be ascertained. There is a limit to the time he can take before marking the boundaries of his claim. He is required to exercise his best judgment from the developments he has been able to make, and he is, of course, confined to his surface location, whether his judgment was right or wrong. The statute should be so construed as to give to the locator what he actually locates; no more and no less. It should be liberally construed in his favor, so as to give him the full benefit of the statute in its true spirit and intent, in order to carry out the wise and beneficent policy of the general government in opening up the mineral lands for exploration and development. When the prospector discovers a vein of ore of sufficient value to

justify the expenditure of time, labor, and money to open up and develop the same, he is honestly and legally entitled to the fruits of his labor. He is admonished by the law that he will be limited in the length of his lode upon its strike to such portion as is within the surface lines of his location, but he is at the same time assured that he will not be limited or deprived of his extralateral rights as to the depth of such lode, upon its dip, the apex of which is within the surface lines of his location. The statute of 1872 gives to locators of mining claims "the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges, throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations." These are their extralateral rights, which should neither be extended nor restricted by the courts. The only limit placed by the statute is that "their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward, as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges." One general principle should pervade and control the various conditions found to exist in different locations, and its guiding star should be to preserve in all cases the essential right given by the statute to follow the lode upon its dip, as well as upon the strike, to so much thereof as its apex is found within the surface lines of the location. If the lode runs more nearly parallel with the end lines than with the side lines as marked on the ground as such, then the end lines of the location must be considered by the courts as the side lines meant by the statute. If the lode runs more nearly parallel with the side lines than the end lines, then the end lines, as marked on the ground, are considered by the court as the end lines of the location. In both cases the extralateral rights are preserved and maintained as defined in the statute.

It may be admitted, as was suggested by counsel in this case, that it would be an herculean task to endeavor to fathom the complications that are liable to arise in the construction of this statute, and to provide for their solution upon any defined method of interpretation. One thing, however, is certain: that, unless it can be done, then the statute is radically wrong, and the sooner amendments are made thereto to avoid such difficulties, the better it will be for the mining industry of the country. In fact, it is a question worthy of consideration whether it would not be advisable to have the mining laws amended so as to adopt the Spanish, Mexican, and Roman rules, and give to the miners a greater width of ground upon the surface,—making a square location,—and confine the owner of the claim to the ground within the boundary planes of his location in length, width, and depth, the same as agricultural land, so as to avoid any further conflict over side and end line propositions that are becoming such fruitful themes of endless dispute and litigation.

This is a question, however, that is solely within the province and discretion of congress.

It will be noticed that the end lines of the Ural are not parallel with each other. The location was made under the law of 1866, which did not require parallelism of the end lines. Walrath v. Mining Co., 63 Fed. 552, and authorities there cited. It was admitted upon the trial by complainant that the northerly end line of the Ural location was the more easterly instead of westerly part thereof, to wit, the line from C. M. 11, "S. 56, 10 W. 5, 13 Ch." to C. M. Co., No. 4, as shown in the diagram taken from the stipulated map. A line drawn across the Ural location parallel with this northerly end line so as to strike the point where the Ural or contact vein crosses the easterly side line of the Ural location would be the southerly end line of the contact vein, and these end lines extended vertically downward would define the rights which complainant is entitled to under its ownership and patent of the Ural lode.

5. What are the rights of complainant, under and by virtue of its patent to the Ural ground, to the southerly part of the Wyoming or slate vein after it crosses the southerly end line of the Wyoming location? Section 2322 of the Revised Statutes, heretofore quoted, gave to the owners of the Ural lode and surface location all other "veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically." This portion of the Wyoming lode was not located by complainant. It was the Ural lode for which the patent was obtained, and under the law of 1866 this was the only lode that was granted; but when the act of 1872 was passed it was so framed as to apply to all mining locations theretofore made as well as to all others to be thereafter made, and the complainant is the owner of so much of the slate or Wyoming vein as has its apex within the surface of the Ural location. But here we are met with the difficulty of determining from the evidence how far the apex of this vein is shown in the Ural claim after leaving the south end line of the Wyoming surface location. This is the most difficult and doubtful question of fact that is presented to the court for its determination. The testimony as to the existence of the slate vein to certain points southerly, near the mouth of the Wyoming shaft, may be said to be fairly established by the evidence. South of that point to the southerly end of the Ural it is not well defined, and is not clearly proven. The court is left in doubt as to the truth. The impression received from an examination of the record might be said to be that the probabilities are in favor of that vein extending through the Ural ground, as claimed by complainant. But the court is not prepared to say that the fact of its existence to that extent has been proven to its satisfaction; and this should be clearly shown before the court would be justified in giving to complainant the right to follow underneath within the surface lines of the New Year's and New Year's Extension claims, belonging to respondent. The respondent has the undoubted right to say to complainant, "Hands off of any and everything within my surface lines extending vertically downward, until you prove that you are working upon and following a vein which has

its apex within your surface claim, of which you are the owner!" Judge Hallett, in Leadville Min. Co. v. Fitzgerald, 4 Morr. Min. R. 385, Fed. Cas. No. 8,158, expresses the true rule upon this subject as follows:

"Within the lines of each location the owner shall be regarded as having full right to all that may be found, until some one can show a clear title to it as a part of some lode or vein having its top or apex in other territory. In other words, we may say that there is a presumption of ownership in every locator as to the territory covered by his location, and within his own lines he shall be regarded as the owner of all valuable deposits until some one else shall show by a preponderance of testimony that such deposits belong to another lode having its top or apex elsewhere."

See, also, Doe v. Mining Co., 54 Fed. 937; Duggan v. Davey (Dak.) 26 N. W. 892.

The facts do not show by a preponderance of evidence that the slate vein extends any further south than the southerly end-line plane of the Ural, and, as the slate vein is not clearly shown to pass that line going south, I am of opinion that complainant is not entitled to any further or other rights than have already been given to it by virtue of its patent to the Ural or contract lode. The same result would be reached if the court should accept the doctrine announced in Patterson v. Hitchcock, 3 Colo. 533, and followed in Armstrong v. Lower, 6 Colo. 399, that, "if the lode located terminates at any point within the location, or departs at any point from the side lines, the location beyond such point is defeasible, if not void."

6. With reference to complainant's rights there is one novel proposition, seriously and earnestly advanced by complainant's counsel, that demands consideration. It is substantially to the effect that where the patent conveys a lode, and independently and clearly marks it out, as the land office has a right to do, and did do in this case, then no collateral attack can be made to the patent so as to show that the lode is in another place from that marked out in the patent; and it was argued that there was a distinction, which should be observed and followed by the courts, between a patent where there is no lode distinctly granted by a specific definition, where the courts must naturally inquire as to its existence and extent in order to determine the rights of the parties, and a case where a patent recites the direction and course of the lode. In the latter case it is claimed that, while the government of the United States might inquire as to its truth, no collateral attack could be made upon it by the owners of other mining locations; that the court is absolutely bound to proceed and act upon the theory that the land office ascertained the facts before it granted the patent; that the definition of the Ural is as complete and perfect to all intents and purposes as it is to the surface boundary lines of the ground itself within which it is included, and upon these grounds complainant denies the right of respondent to show that the Ural or contact vein does not run along the dotted line of the patent—as shown in the diagram—clear through the Ural claim, from end to end of the location and survey. The reply to this is that respondent is not assailing the patent in any manner whatever. It does not deny its validity. It admits that complainant has the title to the contact vein, and to every other lode or vein within the limits of the surface location

of the Ural claim. It denies, and has the right to deny, that any portion of the Ural lode situate southerly from the point where it crosses the easterly side line of the Ural location has its apex within the Ural claim. The answer heretofore given, that complainant must prove that the vein it claims within the surface lines of another mining company has its apex within the lines of its own claim, is directly applicable to this contention. This court cannot presume that the land office determined the course of the lode. The marking of an ideal line across the survey and diagram did not have the effect of putting a lode into the ground if there was no vein there. The respondent has the right to show what the facts are. Mr. Justice Miller, in answering a somewhat similar contention, in his instructions to the jury in Stevens v. Williams, 1 McCrary, 480, Fed. Cas. No. 13,413, said:

"The plaintiff has asked certain instructions which I have refused, * * * and I regret that they should have been introduced. * * * I am asked by him to state that the patent which he has received from the United States for the Iron mine is conclusive that the sheet of mineral matter in question is a vein, within the meaning of the statute. I decline to give this instruction. Certainly, outside of the vertical projection of the side lines of the plaintiff's patented ground, if the defendants can show that the mineral matter which is the subject of this controversy is not a vein, they have the right to show it. Outside of the side lines of the plaintiff projected perpendicularly downward defendants have the right, if they can, to show that the vein, or thing which is called a vein, is not a vein."

7. One more question, and the case is disposed of. It is claimed by respondent that under the form of the pleadings in this case the complainant is not entitled to an accounting; that this action is really an ancillary action at law; and that complainant should have divided its case, and gone upon the law side for its damages and upon the equity side for its injunction. Such is the common; and, as I think, the better, practice, and more in accordance with the rules of this court. But a vast number of authorities were cited by counsel, the weight of which seems to sustain the right of complainant, under the pleadings, to an accounting as well as to an injunction. Let a decree be drawn in conformity with this opinion for an injunction and for an accounting.