## WALRATH *v.* CHAMPION MINING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS OF THE NINTH
CIRCUIT.

No. 230. Argued April 22, 1898. — Decided May 31, 1898.

On the 28th of April, 1871, on a previous location made in 1857, the Provi-
dence Gold and Silver Mining Company obtained a patent in which it was
recited that it was " the intent and meaning of these presents to convey "
to the company "the vein or lode in its entire width for the distance
of 3100 feet along the course thereof.". Under that act a patent could be
issued for only one vein; but the act of May 10, 1872, c. 152, gave to all
locations theretofore made, as well as to all thereafter made, all veins,
lodes and ledges, the top or apex of which lies inside of the surface
lines. September 29, 1877, the Champion Mining Company made a loca-
tion upon the Contact Vein, which overlapped the Providence location,
both as to surface ground and lode. In 1884 a dispute took place, which
brought about relocation of the lode line of the Champion Company; but
eventually the conflicting claims resulted in this suit. *Held,*
  (1) That the extent of the rights passing under the act of 1866 was
      decided by this court in *Mining Co.* v. *Tarbet,* 98 U. S. 463, viz. :
      that " the right to follow the dip of the vein is bounded by the
      end lines of the claim; "
  (2) That that right stops at the end line of the lode location, terminated
      by vertical lines drawn downward;
  (3) That the original location and lode determined those end lines.
The following propositions, announced in *Del Monte Mining Co.* v. *Last
  Chance Mining Co., ante,* 55, are affirmed with the addition that the end
  lines of the original veins shall be the end lines of all the veins found
  within the surface boundaries : "*First,* the location as made on the sur-
  face by the locator determines the extent of rights below the surface.
  *Second,* the end lines, as he marks them on the surface, with the single
  exception hereinafter noticed, place the limits beyond which he may not
  go in the appropriation of any vein or veins along their course or strike.
  *Third,* every vein ' the top or apex of which lies inside of such surface
  lines extended downward vertically ' becomes his by virtue of his location,
  and he may pursue it to any depth beyond his vertical side lines, although
  in so doing he enters beneath the surface of some other proprietor.
  *Fourth,* the only exception to the rule that the end lines of the location
  as the locator places them establish the limits beyond which he may not
  go in the appropriation of a vein on its course or strike is where it is
  developed that in fact the location has been placed not along but across
  the course of the vein. In such case the law declares that those which
  the locator called his side lines are his end lines, and those which he

called end lines are in fact side lines, and this upon the proposition that it was the intent of Congress to give to the locator only so many feet of the length of the vein, that length to be bounded by the lines which the locator has established of his location." ·.

There is no merit in the contention that by agreement, by acquiescence, and by estoppel, the line *f–g* on the plan has become the end line of the two claims.

It is the end lines alone which define the extralateral rights, and they must be straight lines, not broken or curved lines, and to such the right on the vein below is strictly confined.

THIS action, brought in the Superior Court of Nevada County, California, involves title to a triangular shaped section of what is known as the "Contact," "Ural" or "Back" ledge of gold-bearing ore, situated in the same county, claimed by appellant to be a portion of the Providence Mine, to which complainant has title through a patent from the United States, and by appellee, a corporation, to be a part of the New Years Extension Mine owned by it.

The relative situation of the two properties and the portion of the ledge in controversy is shown by Figure No. 1 on page 295; the disputed section being contained between the lines thereon marked "Line claimed by Providence" and "Line claimed by Champion."

The figures marked "New Years" and "New Years Extension" represent the surface of the mining properties owned by defendant, while that marked "Providence Mine" represents the surface of the patented ground of the plaintiff.

The action was brought May 24, 1892, to recover $300,000 damages for ore extracted from the ledge and carried away by the defendant, and for an injunction against further trespasses thereon.

Upon motion of appellee the action was removed to the United States Circuit Court, as involving a Federal question, where the complainant recast his pleadings so as to separate the action into a bill in equity, upon which the action is now proceeding, and an action at law for the damages alleged.

The suit in equity was tried in the Circuit Court and decided mainly in favor of the appellee.

From this decree the appellant appealed to the Court of

# FIG. 1

SHOWING THE END LINES CLAIMED BY EACH, AND THE LINES FIXED BY THE CIRCUIT COURT AND COURT OF APPEALS.

SCALE OF CHAINS

Appeals for the Ninth Circuit, where it was modified, and, as modified, affirmed.

The appellant now brings the case to this court upon writ of error from the Court of Appeals.

The appellant's title is deraigned as follows: In 1857, under the miners' rule and customs then in force, thirty-one locators located thirty-one hundred feet of the Providence or Granite lode. By mesne conveyances the title to this location became vested in the Providence Gold and Silver Mining Company, and on April 28, 1871, that company obtained a patent to thirty-one hundred feet of the lode and for surface ground as described in the patent.

The title thus granted to the Providence Gold and Silver Mining Company was, before the commencement of this suit, vested in the appellant.

The ledge, as granted by the patent, extends thirty feet north of the north surface line of the location and some six hundred and eighty feet south of the south surface line.

The patent conveyed only the Providence ledge and the surface ground. All other ledges contained within the surface lines were expressly reserved.

It is also contended by appellants that, by the act of Congress of May 10, 1872, exclusive possession of all the surface included within the lines of the location was granted to the owners of the Providence, together with all other lodes or ledges having their tops or apexes within such surface lines. This grant, of course, included the Contact vein, subsequently discovered within said boundaries, and now constituting the bone of contention in this action.

The Contact vein is shown in the figure, and crosses the surface line *f–g* of the Providence location.

On September 29, 1877, the appellee and defendant, the Champion Mining Company, made a location upon the Contact vein called the New Years Extension Mine. This location overlapped, both as to surface ground and lode, upon the Providence location; that is, the lode line and surface lines of the said New Years Extension extended to the south of the boundary line *f–g* of the Providence location.

The New Years Extension Mine is shown in Figure No. 2, on page 298, together with the conflict caused by the overlap; the conflicting surface portions being shaded, and showing the Contact vein passing through it.

In the year 1884 the complainant and his coöwners objected to the overlap, and demanded of the Champion Mining Company that it abandon all claims to the surface and lode to the south of the Providence boundary line, above described. Thereupon, in the month of November, 1884, John Vincent, the superintendent of the defendant, the Champion Mining Company, under the authority and by the direction of the said company, relocated the New Years Extension Mine by a notice of relocation, in which the fact of the overlap under the original location was particularly recited, and the lines were readjusted so as to avoid the overlap and to conform to said line *f–g* of the Providence Mine, as shown on Figure 1.

In the notice of relocation the lode line was particularly described as follows: "The lode line of this claim as originally located, and which I hereby relocate, is described as follows: Commencing at a point on the northerly bank of Deer Creek, which point is 60 feet south, 11 degrees 45 minutes east of the mouth of the New Years tunnel, and running thence along the line of the lode towards the N.E. corner of the Providence mill, about S. 46 degrees 15 minutes east, 200 feet, more or less, to a point and stake on the northerly line of the Providence Mine, patented, designated as Mineral Lot No. 40 for the south end of said lode line."

It also contained the following statement:

"And whereas, part of this claim, as originally described and as hereby relocated, conflicts with the rights granted by letters patent of said Providence Mine, said Lot No. 40, now, therefore, so much of this claim, both for lode and surface ground, as originally conflicted or now conflicts with any portion of the surface or lode claims or rights granted by said patent, is and are hereby abandoned, which portion of this claim so abandoned is described as follows: All that portion of the above described New Years Extension Claim for surface and lode which lies south of the northern boundary line of said

Statement of the Case.

# FIG. 2.

NEW YEARS EXTENSION
AS ORIGINALLY LOCATED.

SHADED PART SHOWING LODE AND
SURFACE CONFLICT WITH PROVIDENCE.

Providence Mine, which runs north 43 degrees 10 minutes east, across the southeastern corner of this claim."

The New Years Extension, as relocated, is coterminous with the Providence Mine on the northerly boundary line, designated as the line $f$-$g$, running south 43 degrees west. (Fig. 1.)

That line is the only boundary between the two properties, and the only boundary of the Providence location which is crossed by the Contact ledge.

The first workings of the appellee involved no conflict with appellant. The shaft ran parallel with the Providence line, and none of the levels crossed that line until about three months before this suit was begun, when the 1000 foot level was driven across it into the ground in dispute. Subsequently the eighth and ninth levels were driven across.

The work done by the Providence was carried on through a shaft sunk on the Providence or Granite ledge, from which shaft a crosscut was run back to the Contact vein on the 600 foot level, and another on the 1250 foot level, and much of the ground now in controversy was thereby prospected and opened up by complainant and his coöwners. (See Fig. 1.)

The claims of the respective parties will be readily understood by reference to Fig. 1, which shows the relative position of all the mining properties belonging to both, with the lines claimed by them.

The portion of the Contact vein in dispute is that upon the dip of the ledge lying between the line marked " Line claimed by Providence " and the line marked " Line claimed by Champion."

The apex of the Contact vein is represented by the dotted line $x$-$x^1$, and shows the vein as far as exposed in both the Champion and Providence ground. South of $x$, the course of the vein in the Providence ground is unknown.

The line $f$-$g$ is the same line as that designated A–B by some of the witnesses.

Upon the trial the Circuit Court held that there could be but one end line for each end of the Providence location, and that the lines $g$-$h$ and $a$-$p$ constituted such end lines; that

such lines constituted the end lines of not only the originally discovered Providence lode, but also of every other vein that might be discovered within the surface lines of the location. But, notwithstanding this holding, in entering the decree the line $f$–$g$ was also established as an end line of the Contact vein, but for its length only, and then that from "$g$" the line $g$–$h$, and that line extended indefinitely eastwardly, constituted another end line for the same end of the lode, and constituted the line through which the plane determinative of all extralateral rights in the vein must be drawn.

From this decree the appellant here was allowed an appeal to the Circuit Court of Appeals.

The latter court established the line $g$–$h$–$h^1$ as the sole end line of the Contact vein, and reversed the decree of the Circuit Court in so far as it fixed the line $f$–$g$ as an end line.

As a result of this decree the complainant was not only shut out of all extralateral rights in the Contact vein north of the line $g$–$h$–$h^1$, but also of that portion of the vein lying vertically beneath the surface lines of the Providence which extend north of that line, and which are marked upon the figures as constituting the parallelogram $h$–$i$–$k$–$h^1$, which was awarded to the Champion. (See Fig. 1, showing the end line fixed by the Circuit Court, and that line as subsequently fixed by the Court of Appeals, with the latter line extended in its own direction both eastwardly and westerly.)

From the judgment of the Circuit Court of Appeals the appellant has appealed to this court.

There are nine assignments of error. The first eight attack so much of the decree as establishes the line $g$–$h$ as an end line, for the purpose of determining the extralateral right, or fails to establish the line $f$–$g$, and that line produced indefinitely in the direction of $g^1$ as such end line. The last two assail so much of the decree as awards to appellee the right to pursue the vein on its downward course underneath the parallelogram $h$–$i$–$k$–$h^1$.

*Mr. R. R. Bigelow* for appellant. *Mr. Daniel Titus* and *Mr. James F. Smith* were on his brief.

*Mr. Curtis H. Lindley* for appellee.

MR. JUSTICE McKENNA, after making the above statement, delivered the opinion of the court.

There are two questions presented by the assignment of errors:

(1.) What are the extralateral rights of the appellant on the Contact vein?

(2.) Is appellant entitled to that portion of the Contact vein within the Providence boundaries which lies north of the north end line fixed by the court, and which is described upon Fig. 1 as the parallelogram bounded by the lines marked *h–i–k–h*?

(1.) The appellant contends that the patent of the Providence ledge was conclusive evidence of his title to thirty-one hundred feet in length of that vein. If true, this carried the northern end of the ledge thirty feet beyond the line fixed by either the Circuit Court or the Circuit Court of Appeals. It was truly said at bar: "If it is not the end line of the Providence location, then certainly there is no reason for holding it to be the end line of the Contact vein."

The language of the patent is: "It being the intent and meaning of these presents to convey unto the Providence Gold and Silver Mining Company, and to their successors and assigns, the said vein or lode in its entire width for the distance of thirty-one hundred (3100) feet along the course thereof."

The patent was issued under the act of 1866, and it is necessary, therefore, to some extent to consider that act. By it, the appellant urges, the principal thing patented was the lode, and that the northern limit of that, and hence of his rights on that was thirty feet north of the line fixed by the Circuit Court of Appeals; and hence it is further contended that as the northern and southern surface line (*g–h* and *a–p*) did not determine or limit his right to the lode under the act of 1866 — in other words, did not become end lines — they do not become end lines upon the Contact ledge (*x'–x''*) acquired under the act of 1872, but that the surface line which crosses.

the strike of that ledge must be held to be the end line, and the line which fixes the rights of the parties. This line is $f$-$g$, Fig. 1, and, if appellant is correct, determines the controversy .in his favor.

The extent of the right passing under the act of 1866 has been decided by this court.

In *Mining Co.* v. *Tarbet*, 98 U. S. 463, known as the *Flagstaff case*, the ·superficial area of the Flagstaff Mine was one hundred feet wide by twenty-six hundred feet long. It lay across the lode, not with ·it, and the. company contended, notwithstanding that, it had a· right 'to the lode for the length of the location. In other words, the contention was that it was the lode which was granted, and that the surface ground was a mere incident for the convenient working of the lode.. The ·contention was presented and denied by the instructions which were given and· refused by the lower court. That court instructed the jury that if they found Tarbet " was in possession of the claim, describing it, holding the same in accordance with· the mining. laws and the customs of the· miners of the mining district, and that the apex and course of the vein in dispute are within such surface, then, as against one subsequently entering, he is deemed to be possessed of the land within his boundaries to any depth, and also of the vein in the surface·to any depth on its dip, though the vein in its dip downward passes the side line of the surface boundary and extends beneath.other and adjoining lands, and a trespass upon such part of the vein on its dip, though beyond the side surface line, is unlawful to the same extent as a trespass on the vein inside of the surface boundary. This possession of the vein outside of the surface line, on its dip, is limited in two ways — by the length of the course of the' vein within the surface; and by an extension of the end lines of the surface claim vertically, and in their own direction, so as to intersect the vein on its dip; and the right of a possessor to recover for trespass on ' the vein is subject to only these restrictions."·

Again·: " The defendant (plaintiff in' error) has not shown ·any title or color of title to any part of the vein, except so much of its length on the course as lies within the Flagstaff

surface, and the dip of the vein for that length; and it has shown no title or color of title to any of the surface of the South Star and Titus mining claim, except so much of No. 3 as lies within the patented surface of the Flagstaff mining claim."

And the following instructions propounded by the owner of the Flagstaff:

"By the act of Congress of July 26, 1866, under which all these locations are claimed to have been made, it was the vein or lode of mineral that was located and claimed; the lode was the principal thing, and the surface area was a mere incident for the convenient working of the lode; the patent granted the lode, as such, irrespective of the surface area, which an applicant was not bound to claim; it was his convenience for working the lode that controlled his location of his surface area; and the patentee under that act takes a fee simple title to the lode, to the full extent located and claimed under said act."

Commenting on the instructions, Mr. Justice Bradley, speaking for the court, said:

"These instructions and refusals to instruct indicate the general position taken by the court below, namely, that a mining claim secures only so much of a lode or vein as it covers along the course of the apex of the vein on or near the surface, no matter how far the location may extend in another direction."

And after stating that the act of 1872 was more explicit than that of 1866, but the intent of both undoubtedly the same, as it respects lines and side lines, and the right to follow the dip outside of the latter, he proceeded as follows:

"We think that the intent of both statutes is, that mining locations on lodes or veins shall be made thereon lengthwise, in the general direction of such veins or lodes on the surface of the earth where they are discoverable; and that the end lines are to cross the lode and extend perpendicularly downwards, and to be continued in their own direction either way horizontally; and that the right to follow the dip outside of the side lines is based on the hypothesis that the direction of

these lines corresponds substantially with the course of the lode or vein at its apex on or near the surface. It was not the intent of the law to allow a person to make his location crosswise of a vein so that the side lines shall cross it, and thereby give him the right to follow the strike of the vein outside of his side lines. That would subvert the whole system sought to be established by the law. If he does locate his claim in that way, his rights must be subordinated to the rights of those who have properly located on the lode. Their right to follow the dip outside of their side lines cannot be interfered with by him. His right to the lode only extends to so much of the lode as his claim covers. If he has located crosswise of the lode, and his claim is only one hundred feet wide, that one hundred feet is all he has a right to. This we consider to be the law as to locations on lodes or veins.

"The location of the plaintiff in error is thus laid across the Titus lode, that is to say, across the course of its apex at or near the surface; and the side lines of the location are really the end lines of the claim, considering the direction or course of the lode at the surface.

"As the law stands, we think that the right to follow the dip of the vein is bounded by the end lines of the claim, properly so called; which lines are those which are crosswise of the general course of the vein on the surface. The Spanish mining law confined the owner of a mine to perpendicular lines on every side, but gave him greater or less width according to the dip of the vein. See Rockwell, pp. 56–58 and pp. 274–275. But our laws have attempted to establish a rule by which each claim shall be so many feet of the vein, lengthwise of its course, to any depth below the surface, although laterally its inclination shall carry it ever so far from a perpendicular. This rule the court below strove to carry out, and all its rulings seem to have been in accordance with it."

This law was followed and applied in *Argentine Mining Co.* v. *Terrible Mining Co.*, 122 U. S. 478; in *Iron Silver Mining Co.* v. *Elgin Mining Co.*, 118 U. S. 196; and in *King* v. *Amy & Silversmith Min. Co.*, 152 U. S. 222. The locations passed upon in these cases were made under the act of 1872,

but we have seen that the intent of that act and the act of 1866, "as it respects end lines and side lines," was the same.

But appellant urges that "those cases are not in point here." We think that they are. The patent in the *Flagstaff case* appears to have been the same as here, and besides whatever the patent here it must be confined to the rights given by the statute which authorized it.

In the *Flagstaff case* the lode was claimed, and hence the right to follow it beyond the surface boundaries of the location was claimed. Here the lode is claimed and the right to follow it outside of the surface boundaries, that is, beyond the line *f–g* to the point $x^1$. In that case the right contended for was denied on the principle applicable to end and side lines. In this case the right contended for must be denied by the application of the same principle.

But, appellant asks, admitting for the argument's sake that it (the line *g–h*) does constitute an end line of the location within the meaning of the law of May 10, 1872, does it constitute the end line of the Contact vein? And in answering the question he says: "The end line of a lode is the boundary line which crosses it regardless of whether it was originally intended as an end line or side line. Four times has this principle been sustained by this court." He then cites the cases we have cited, and claims that they "are of course conclusive of this controversy if they are in point."

Under the law of July 26, 1866, c. 262, a patent could be issued for only one vein. 14 Stat. 251. The act of 1872 gave to all locations theretofore made, as well as to those thereafter made, all veins, lodes and ledges the top or apex of which lie inside of the surface lines. Section 3 of the act, which is also section 2322 of the Revised Statutes, is as follows:

"The locators of all mining locations heretofore made, or which shall hereafter be made, on any mineral vein, lode or ledge, situated on the public domain, their heirs and assigns, where no adverse claim exists on the tenth day of May, eighteen hundred and seventy-two, so long as they comply with the laws of the United States, and with the state, ter-

ritorial and local regulations not in conflict with the laws of
the United States governing their possessory title, shall have
the exclusive right of possession and enjoyment of all the
·surface included within the lines of their locations, and of all
veins, lodes and ledges throughout their entire depth, the top
or apex of which lies inside of such surface lines extended
downward vertically, although such veins, lodes or ledges
may so far depart from a perpendicular in their course down-
ward as to extend outside the vertical side lines of such sur-
face locations. But their right of possession to such outside
parts of such veins or ledges shall be confined to such por-
tions thereof as lie between vertical planes drawn.downward,
as above described, through the end lines of their locations,
so continued in their own direction that such planes will
intersect such exterior parts of such veins or ledges. And
nothing in this section shall authorize the locator or possessor
of a vein or lode which extends in its downward course be-
yond the vertical lines of his claim.to enter upon the surface
of a claim owned or possessed by another." Act of May 10,
1872, c. 152, § 3 ; Sec. 2322, Rev. Stat.

Appellant's right upon the Contact· vein is given by this
statute. What limits this right extralaterally ? The statute ·
says vertical planes drawn downward through the end lines of
the location. What end lines ? Those of and as determined
by the original location and lode, the Circuit Court of Appeals
decided. Those determined by the direction of the newly
discovered lodes, regardless whether they were originally in-
tended as end lines .or side lines, the appellant, as we have
seen, contends. The Court of Appeals was right. Against
the contention of appellant the letter and spirit of the statute
oppose, and against it the decisions of this court also oppose.

The language of the statute is that the " outside parts "
of the veins or ledges· " shall be confined to such portions
thereof as ·lie between vertical planes drawn downwards
. . . through the end lines of their locations. . . ."
And Mr. Justice Field, speaking for the court, said, in *Iron
Silver Mining Co.* v. *Elgin Mining Co.*, 118 U. S. 196, 198 :

" The provision of the statute, that the locator is entitled

throughout their entire depth to all the veins, lodes or ledges, the top or apex of which lies inside of the surface lines of his location, tends strongly to show that the end lines marked on the ground must control. It often happens that the top or apex of more than one vein lies within such surface lines, and the veins may have different courses and dips, yet his right to follow them outside of the side lines of the location must be bounded by planes drawn vertically through the same end lines. The planes of the end lines cannot be drawn at a right angle to the courses of all the veins if they are not 'identical."

The court, however, did not mean that the end lines, called such by the locator, were the true end lines, but those which "are crosswise of the general course of the vein *on the surface.*"

This court in *Del Monte Mining Co.* v. *Last Chance Mining Co.*, decided at the present term, *ante,* 55, reviewed the cases we have cited, and, speaking for the court, Mr. Justice Brewer said :

"Our conclusion may be summed up in these propositions : First, the location as made on the surface by the locator determines the extent of rights below the surface; second, the end lines, as he marks them on the surface, with the single exception hereinafter noticed, place the limits beyond which he may not go in the appropriation of any vein or veins along their course or strike ; third, every vein, 'the top or apex of which lies inside of such surface lines extended downward vertically,' becomes his by virtue of his location, and he may pursue it to any depth beyond his vertical side lines, although in so doing he enters beneath the surface of some other proprietor; fourth, the only exception to the rule that the end lines of the location as the locator places them establish the limits beyond which he may not go in the appropriation of a vein on its course or strike is where it is developed, that, in fact, the location has been placed not along, but across the course of the vein. In such case, the law declares that those which the locator called his side lines are his end lines, and those which he called end lines are in fact side lines, and this, upon the proposition that it was the intent of Congress to give

to the locator only so many feet of the length of the vein, that length to be bounded by the lines which the locator has established of his location. Our laws have attempted to establish a rule by which each claim shall be so many feet of the vein, lengthwise of its course, to any depth below the surface, although laterally its inclination shall carry it ever so far from a perpendicular." *Mining Company* v. *Tarbet*, 98 U. S. 463–468.

These propositions we affirm, with the addition that the end lines of the original veins shall be the end lines of all the veins found within the surface boundaries.

The appellant contends that by agreement, by acquiescence and by estoppel the line *f–g* has become the end line between the two claims.

This contention is attempted to be supported by; (*a*), a relocation of the New Years Extension Claim, by which it is asserted it recognized and designated the line *f–g* as the northerly end line of the Providence claim; (*b*), the testimony of the superintendent as to what took place between him and the directors before sinking the Champion shaft, and afterwards between him and a cotenant of complainant (appellant).

(*a*.) The relocation does not in terms recognize the line *f–g* as the northern end line of the Providence. Its recitals are:

"And whereas, part of this claim as originally described and as hereby relocated, conflicts with the rights granted by the letters patent of said Providence Mine, said Lot No. 40, now, therefore, so much of this claim, both for lode and surface ground, as originally designated, conflicting, or now conflicts, with any portion of the surface or lode, claims or rights granted by said patent, is and are hereby abandoned."

"Which portion of this claim so abandoned is described as follows: All that portion of the above described New Years Extension Claim for surface and lode which lies south of the northern boundary line of said Providence Mine, which runs north 43 degrees, 10 minutes east, across the southeastern corner of this claim."

It will be observed by reference to Fig. 1 that the northern

boundary of the Providence is not one line, but two lines, and it is the one which runs north 43° 10' east across the southern corner, which is designated in the relocation of the New Years claim.

In the notice of relocation, however, the northerly line of the Providence is called the south end line of the relocated ground. The description is as follows:

"The lode line of this claim as originally located, and which I hereby relocate, is described as follows: Commencing at a point on the northerly bank of Deer Creek, which point is 80 feet S., 11 deg. 45 minutes east of the mouth of the New Years tunnel and running thence along the line of the lode towards the N.E. corner of the Providence Mill, about S. 46 deg. 15 minutes east, 200 feet more or less, to a point and stake on the northerly line of the Providence Mine, patented, designated as Mineral Lot No. 40 for the south end of said lode line. And that the Contact vein crosses in its onward course the southerly end line of said New Years Extension Claim and enters the lands and premises of plaintiff described in said bill of complaint."

It is hence contended that if the line *f–g* is the southerly end line of the New Years extension it must necessarily be the northern end line of the Providence Mine. This does not follow, nor is there any concession of it. Coincidence of lines between claims does not make them side lines or end lines. Whether they shall be so regarded depends upon the legal considerations which we have already sufficiently entered into and need not repeat. We do not say that there may not be an agreement settling end lines. One example of such an agreement was exhibited in *Richmond Mining Co.* v. *Eureka Mining Co.*, 103 U. S. 839.

(*b*.) The testimony relied on was admitted against the objection of defendants (appellees). It was as follows:

"Q. Then you may go on, Mr. Vincent, and state how you started that work, and how you planned it, and what communications you had, if any, with the board of directors of the Champion Mining Company.

\*          \*          \*          \*          \*

" A. Well, I was sent up by the board of directors to do whatever work I thought was for the best of the company. I started that shaft down and had it down about 40 feet, and I reported to the board of directors in. session about what work I had done, and they calculated to go to work and put up hoisting works and run that shaft down further.

" Q. What, if any, communication did you make, or was there any communication from the board to you concerning the direction of the shaft, and why any given direction was adopted for the shaft?

" A. There was none, but then I reported to the board that such was the case, that the shaft was laid out so it would never interfere with this line."

The witness further testified that he sank the shaft 540 feet and was discharged on the 1st. of August, 1889, and he was further questioned as follows:

" Q. State whether at the time you were sinking that shaft you were called upon by Mr. Walrath, the complainant in this action, or his brother Mr. Richard Walrath, to make any inquiry of you concerning the construction of that shaft and what the intention was, whether to cross the Providence line or not, as marked on the map?

*　　　*　　　*　　　*　　　*

" A. Well; Mr. Walrath he happened to come along, and he made a remark to me that he wished for us, of course, to keep his line and not to cross it as he didn't want any more trouble as he did have with some other mining properties adjoining; that he didn't want any more holes in his ground, and so I answered him that I would respect his line as long as I am here.

" The Court. — That you would respect his line as long as you were there?

" A. As long as I was superintendent of the mine.

" Q. Where did this conversation take place?

" A. Right on the premises.

" Q. You were then acting as superintendent, were you?

" A. Yes, sir.

" Q. What line was referred to at that time as the Providence line; can you point it out on the map?

"A. Yes, sir; it is the line marked 'A B' on the map, Exhibit 4."

This testimony does not establish an equitable estoppel, nor is the corporation bound by the declarations of the superintendent. They were without the scope of his agency or authority.

(2.) The right of that portion of the Contact ledge within the boundaries of the parallelogram $h$–$i$–$k$–$h^1$ presents an interesting question. It does not appear to have been submitted to either of the lower courts, but the right by the decree of the Circuit Court is given to appellee by adjudging to it that portion of the vein on its dip which lies northeasterly of the line $g$–$h$ and its continuation.

The question is a new one in this court, but we think it is determined by the principles hereinbefore laid down. It may be true that under the act of 1866 the patenting of the Providence Mine in its irregular shape was in all respects legal and proper, and that the act did not require the location to be made in the form of a parallelogram or in any particular form, and that there was no requirement that the end lines should be parallel. It is also true that under that act only one vein could be included in a location, no matter how much surface ground was included in the patent, but that under the act of 1872 possession and enjoyment of all the surface included within the lines of their location and of all veins, lodes and ledges throughout the entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, were given.

But rights on the strike and on the dip of the original vein and rights on the strike and on the dip of the other veins, we have decided, are determined by the end lines of the location. In other words, it is the end lines alone, not they and some other lines, which define the extralateral right, and they must be straight lines, not broken or curved ones. The appellant, under his contention, would get the right such lines would give him and something more besides outside of them. To specialize, he would get all within a plane drawn through the line $g$–$h$, and all within the planes drawn through the sides of the parallelogram $h$–$i$–$k$–$h^1$ (Fig. 1).

It may be that the end lines need not be parallel under the act of 1866; may converge or diverge, and may even do so as to new veins, of which, however, we express no opinion, but they must be straight — no other define planes which can be continuous in their own direction within the meaning of the statute. It may be that there was liberty of surface form under that act, but the law strictly confined the right on the vein below the surface. There is liberty of surface form under the act of 1872. It was exercised in *Iron Silver Mining Co.* v. *Elgin Mining Co.*, *supra*, in the form of a horseshoe; in *Montana Co. Limited* v. *Clark*, 42 Fed. Rep. 626, in the form of an isosceles triangle.

*The decree is affirmed.*