EMPIRE MILLING & MINING CO. v. TOMBSTONE MILL & MINING CO.

(Circuit Court, D. Connecticut. March 29, 1900.)

No. 450

1. FOREIGN CORPORATIONS—STATE REGULATION—VALIDITY.
   A territorial statute requiring foreign corporations, before carrying on business within the territory, to file copies of their articles of incorporation, and appoint an agent on whom process may be served therein, imposes reasonable requirements as a condition precedent to the right to do business in the territory, and is valid.

2. SAME—CARRYING ON BUSINESS IN A STATE—WHAT CONSTITUTES.
   A single contract made by a corporation owning mining ground in a territory, by which it employs and agrees to pay a second party to exploit and develop the property, does not constitute a carrying on of business in the territory by the corporation, within the meaning of a statute requiring foreign corporations carrying on business within the territory to file copies of their articles of incorporation, and providing that every act done by them prior to the filing thereof shall be void; and such statute does not affect the validity of the contract.[1]

3. MINING CLAIMS—EFFECT OF MISTAKE AS TO DIRECTION OF LODE.
   Under the rule that where a lode mining claim is located across, instead of along, the vein, the original side lines become end lines, and the end lines side lines, the owner is entitled to all the rights with reference to the new side lines that he would have had if they had originally been located as such, including the right to follow the dip of a vein having its apex within the surface boundaries of his claim beyond the vertical plane passing through such lines.

4. ESTOPPEL—CONTRACT MADE UNDER MISTAKE.
   Defendant, the owner of a mine, contracted with plaintiff, which owned an adjoining claim, to extend its workings into such claim, for a stipulated price, for the purpose of exploiting and developing the property, and agreed that, should any marketable ore be taken therefrom in the course of such development, it would sell the same, and account to plaintiff for the proceeds. *Held*, that defendant was not estopped by such contract from claiming the proceeds of ore so removed and sold as its own, where, in making the development, it discovered that the vein from which it took such ore had its apex within the lines of its own claim, and the ore was, therefore, its own property.

On Demurrer to Answer.

Gross, Hyde & Shipman and L. P. Waldo Marvin, for plaintiff.
Wm. P. Williams and S. C. Dunham, for defendant.

TOWNSEND, District Judge. Demurrers to answer in an action at law. The complaint is in four counts. The causes of action therein alleged arise out of a contract executed by the parties which is as follows:

"Articles of agreement made this 18th day of January, A. D. 1894, between the Tombstone Mill & Mining Company of Connecticut by its general manager, W. J. Cheyney, party of the first part, and the Empire Milling & Mining Company of Maine, by its president, party of the second part.

"First. That said party of the first part, having opened up its mine to within a few feet of the dividing line between the properties of the two companies, affording an opportunity to exploit and develop the Empire mine, the

---

[1] As to what constitutes carrying on business in state, see note to Wagner v. J. & G. Meakin, 33 C. C. A. 585.

property of the party of the second part, at a cost much less, and in a shorter space of time. than possible to be done through its own shaft, or by any other method now known to the party of the second part, and the party of the second part being desirous that the said exploiting and developing be done to the extent possible under an expenditure of ten thousand dollars ($10.600). the said party of the first part hereby agrees to undertake the said work for and on behalf of the party of the second part, and binds itself to prospect and develop the said Empire mine, using its best knowledge, skill, and care, doing all the said work as thoroughly, perfectly, and economically as if the said work were being done on its own property, to report the result of its work as progress is made, and to complete said work by or before the first day of March, A. D. 1895; the said party of the second part to have all reasonable facilities afforded it for entering the property and inspecting the work, all for the consideration hereinafter named.

"Second. The party of the second part hereby agrees that the party of the first part shall have the right to repair and use the Empire shaft at its discretion, and it hereby agrees and binds itself to pay to the party of the first part such sums of money as may be called for from time to time, the aggregate not to exceed the sum of ten thousand dollars ($10,000).

"Third. Should any marketable ore be extracted in the course of the aforesaid developments, it is hereby agreed that the said party of the first part shall sell the same on the same basis as it sells its own ores, accounting to the party of the second part therefor; and, in consideration of the covenants and agreements hereof it is mutually agreed that the party of the first part shall be allotted and paid such equitable portion of the proceeds of sale of said ores as may hereafter be agreed upon between the said parties.

"In witness whereof we have hereunto subscribed our names and affixed our seals the day and date before mentioned.

"[Seal.]        The Tombstone Mill & Mining Company,
                "By W. J. Cheyney, its General Manager.
"[Seal.]        The Empire Milling & Mining Company,
                "By D. C. Cutler, President.
                "H. S. Vanderbilt, A. C.,
                "Empire M. & M. Co."

The plaintiff is a Maine corporation, owning a mine in the territory of Arizona. At the date of the execution of said contract it had not filed copies of its articles of incorporation with the secretary of said territory, as provided by its laws, nor appointed an agent for the service of process. It is admitted that said contract was not made in said territory. The provisions of the Arizona statute referred to are as follows (Rev. St. 1887, tit. 12, c. 7):

"(1) Any company incorporated under the laws of any other state or territory for any enterprise, business pursuit or occupation proposed to be carried on, or the principal office or place of business is proposed to be located within this territory, shall make and file certified and duly authenticated copies of their acts of incorporation with the secretary of this territory and the county recorder of the county in which its business or principal office is located.

"(2) It shall be the duty of any association, company or corporation, organized or incorporated under the laws of any other state or territory or foreign country, for the purposes of engaging in or carrying on any enterprise, business pursuit or occupation, or acquiring, holding or disposing of any property within this territory, to file with the secretary of this territory and the county recorder of the county in which such enterprise, business pursuit or occupation is proposed to be located or is located, the lawful appointment of an agent upon whom all notices and processes, including service of summons, may be served, and when so served shall be deemed, taken and held to be a lawful personal service on such association, company or corporation for all purposes whatsoever.

"(3) No corporation such as is mentioned in section 1 of this chapter shall transact any business whatsoever in this territory until and unless it shall

have first filed its articles of incorporation, and every act done by it prior to the filing thereof shall be utterly void."

The plaintiff contends that, if the foregoing provisions could be so construed as to extend to single isolated contracts, such as that here in question, the statute would be unconstitutional, because in conflict with the commercial clause of the federal constitution. This statute merely requires compliance by foreign corporations with reasonable requirements as a condition precedent to their right to do business within the territory. It is well settled that such reasonable provisions are valid. Manufacturing Co. v. Ferguson, 113 U. S. 727, 5 Sup. Ct. 739, 28 L. Ed. 1137; Bank v. Page, 6 Or. 431; Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357; In re Comstock, 3 Sawy. 218, Fed. Cas. No. 3,078; Assurance Co. v. Rosenthal, 55 Ill. 85. But the question also arises whether this contract by which the plaintiff employed the defendant to develop its mine amounts to a carrying on of business in the territory of Arizona, as contended by defendant. The contract provides that, inasmuch as the defendant had opened up its mine in such a way as to afford an opportunity to exploit and develop the plaintiff's mine at less cost and in shorter time than it could possibly be done through plaintiff's shaft, defendant would undertake said work for the plaintiff, and "binds itself to prospect and develop the said mine, using its best knowledge, skill, and care," and to report the results, and to afford to the plaintiff reasonable facilities for inspecting work, etc. The agreement in regard to the taking out of ore is only conditional and incidental, it being provided that, "should any marketable ore be extracted in the course of the aforesaid developments," the defendant should sell it, and account to the plaintiff. The single contract for the doing of this work, which, presumably, was precedent to a determination by plaintiff whether it would or would not do business in the territory of Arizona, is not a carrying on of business, within the provisions of said statute. It is settled that isolated transactions, such as the making of a single contract for a limited purpose, are not within the prohibition of such statutes. Thomp. Corp. § 7936, and cases cited; Manufacturing Co. v. Ferguson, supra; Paul v. Virginia, supra. The demurrers to the defenses based on this statute are sustained.

The next question raised by the demurrers affects the ownership of the ore beneath the surface. Defendant, in extending its shafts into the territory included within the surface lines of plaintiff's mine, found that in making their original location they mistook the direction of the lode, and made said location crosswise instead of lengthwise of the vein. In following the vein under plaintiff's surface lines, they found that the vein, the apex of which was on their property, extended laterally under the surface of plaintiff's location. The federal statutes of 1872 in regard to the location of mining claims are as follows:

"Sec. 2320. Mining-claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, heretofore located, shall be governed as to length along the vein or lode by the customs, regulations and laws in force at the date of their location. A mining-claim located after the tenth day of May, eighteen hundred and

seventy-two, whether located by one or more persons, may equal, but shall not exceed, one thousand five hundred feet in length along the vein or lode; but no location of a mining-claim shall be made until the discovery of the vein or lode within the limits of the claim located. No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface, nor shall any claim be limited by any mining regulation to less than twenty-five feet on each side of the middle of the vein at the surface, except where adverse rights existing on the tenth day of May, eighteen hundred and seventy-two, render such limitation necessary. The end-lines of each claim shall be parallel to each other."

"Sec. 2322. The locators of all mining locations heretofore made or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim exists on the tenth day of May, eighteen hundred and seventy-two, so long as they comply with the laws of the United States, and with state, territorial and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface-lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end-lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. And nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another."

The purport of this statute is that at their ends locations shall be bounded by vertical planes, but that at the sides they may follow the dip of the vein, even though they extend under the surface of other locations. These regulations have been interpreted as showing an intent that mining locations should be in the shape of parallelograms, the end lines crossing the strike of the vein at nearly right angles to it, and the side lines substantially parallel to said strike. Iron Silver Min. Co. v. Elgin Mining & Smelting Co., 118 U. S. 196, 6 Sup. Ct. 1177, 30 L. Ed. 98. It has sometimes happened, however,—as in the present instance,—that by mistake a prospector or locator has accidentally located his claim crosswise of a vein instead of parallel thereto. In such a case it is well settled that his side lines as located become his end lines, and that he cannot proceed beyond the limit of a vertical plane extended downward therefrom. The question here raised and claimed to be novel is this: In such a case, do the end lines become side lines in the sense that the locator may follow the dip of the vein outside of a plane extended vertically downward therefrom? In Mining Co. v. Tarbet, 98 U. S. 463, 38 L. Ed. 253, the court said, referring to such a condition:

"It was not the intent of the law to allow a person to make his location crosswise of a vein so that the side lines shall cross it, and thereby give him the right to follow the strike of the vein outside of his side lines. That would subvert the whole system sought to be established by the law. * * * The location of the plaintiffs in error is thus laid across the Titus lode.—that is, across the course of its apex at or near the surface; and the side lines of the location are really the end lines of their claim, considering the direction or course of the lode at the surface. As the law stands, we think that the right to follow the dip of the vein is bounded by the end lines, properly so called,

which lines are those which are crosswise of the general course of the vein on the surface."

Counsel for plaintiff claims that, inasmuch as the individual who locates his claim crosswise of a vein makes a mistake in so doing, he must suffer the penalty for said mistake, and that beyond the vertical plane of his boundary lines he has no extralateral rights. That is to say, that the end lines as originally located remain end lines in the sense of the statute, while the original side lines also become end lines, and the claim thus becomes bounded by four end lines, beyond the vertical planes of none of which the owner may follow the dip of the lode. Counsel for defendant contends that, inasmuch as the supreme court has repeatedly, without any qualifications, said that the side lines in such case become the end lines and the end lines side lines, and as the statute defines what shall be the rights of a locator with reference to his end and side lines, those rights attach as a matter of course to the new side lines, and that the party who makes the mistake is sufficiently punished or limited by reason of the fact that he cannot extend his boundaries beyond the new end lines. Although no decision has been cited where this precise question was in issue, the latter view seems more in accord with the language and spirit of the decisions in somewhat analogous cases. Thus, in King v. Mining Co., 152 U. S. 222, 228, 14 Sup. Ct. 512, 38 L. Ed. 422, the court says:

"The most that the court can do, where the lines are drawn inaccurately and irregularly, is to give to the miner such rights as his imperfect location warrants under the statute. It cannot relocate his claim, and make new side lines or end lines. Where it finds, as in this case, that what are called side lines are in fact end lines, the court, in determining his lateral rights, will treat such side lines as end lines and such end lines as side lines."

In Last Chance Min. Co. v. Tyler Min. Co., 157 U. S. 683, 15 Sup. Ct. 733, 39 L. Ed. 859, Mr. Justice Brewer, in delivering the opinion of the court, says:

"The course of this vein is across the Last Chance claim, instead of in the direction of its length. Under those circumstances the side lines of that location become the end lines, and the end the side lines. Mining Co. v. Tarbet, 98 U. S. 463, 25 L. Ed. 253; Argentine Min. Co. v. Terrible Min. Co., 122 U. S. 478, 7 Sup. Ct. 1356, 30 L. Ed. 1140; King v. Mining Co., 152 U. S. 222, 14 Sup. Ct. 419."

In Consolidated Wyoming Gold-Min. Co. v. Champion Min. Co. (C. C.) 63 Fed. 540, 547, the general principle is thus stated:

"When a mining claim is located across, instead of along, the lode, its side lines must be treated as its end lines, and its end lines as its side lines; so that, under Rev. St. § 2322, the dip cannot be followed outside the vertical plane of the original side lines into an adjoining claim."

The principle above stated seems to be in accord with that of the decisions in the following cases, in most of which the lode, while passing through the end of the claim as located, passed out at one of the sides, or from some other cause failed to reach the other end. Mining Co. v. Tarbet, 98 U. S. 463, 25 L. Ed. 253; Iron Silver Min. Co. v. Elgin Mining & Smelting Co., 118 U. S. 196, 6 Sup. Ct. 1177, 30 L. Ed. 98; Argentine Min. Co. v. Terrible Min. Co., 122 U. S. 478, 7 Sup. Ct. 1356, 30 L. Ed. 1140; King v. Mining Co., 152 U. S. 222, 14

Sup. Ct. 510, 38 L. Ed. 419; Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co., 171 U. S. 55, 18 Sup. Ct. 895, 43 L. Ed. 72; Walrath v. Mining Co., 171 U. S. 293, 18 Sup. Ct. 909, 43 L. Ed. 170. A careful examination of the case of Catron v. Olds (Colo. Sup.) 48 Pac. 687, relied on by counsel for plaintiff, shows that the question herein involved was not presented on the record. The demurrers on this point are overruled.

Another contention of the parties raised by the demurrers is upon the question of estoppel by deed and in pais. Plaintiff claims that, as the defendant went upon the property of the plaintiff, and removed and sold said ore under said contract, it cannot now claim that it was not the property of the plaintiff. In short, that this is the case of an executed contract where the plaintiff, having performed its part of the contract, and permitted the defendant to take the property under an agreement to account for the same, now finds the defendant denying its title, and refusing to pay, and thereupon plaintiff brings its action for money had and received. Defendant, in exploiting and developing for plaintiff, found that the ore thus brought to light was its own property. Neither party anticipated any such result when the contract was made. The defendant is not estopped from claiming title to its property. The demurrers on this point are overruled.