EMPIRE MILL. & MIN. CO. v. TOMBSTONE MILL & MIN. CO.

(Circuit Court, D. Connecticut. July 1, 1904.)

No. 450.

1. MINES AND MINING—LOCATION OF CLAIM—ERRORS.

Where the locators of a mining claim mistook the direction of the vein manifested by the outcrop of ore on the surface, and laid out their claim crosswise instead of lengthwise of the vein, the original side lines of the claim became the legal end lines, and the original end lines became the legal side lines, so that the locators were entitled to follow the vein within the surface lines of the claim on its downward course into the earth so far as it departs from a perpendicular as to carry it underground beyond the legal side lines to a point where it shall be cut off by its legal end lines vertically extended perpendicularly in their own direction.

2. CONVERSION OF ORE—TRESPASS—ESTOPPEL—PLEADING.

Where, in an action to recover for the conversion of ore, plaintiff took the ground that defendant was a naked trespasser when he took away the ore underneath the surface lines of plaintiff's claim, plaintiff could not plead that defendant was estopped to claim the right to remove such ore under a contract between the parties for the development by defendant of plaintiff's mine.

3. CONTRACTS—MONEY PAID—MISAPPLICATION—RECOVERY.

Where plaintiff paid money to defendant under a contract by which defendant agreed to develop plaintiff's mine, but the money was in fact

expended by defendant in cutting inclines, drifts, etc., which either helped defendant directly in getting out its own ore, or developed workings which might have shown other ore belonging to defendant if they had not proved barren, plaintiff was entitled to recover the money so paid.

At Law.

Gross, Hyde & Shipman and L. P. Waldo Marvin, for plaintiff.
Stimson & Williams and John K. Beach, for defendant.

PLATT, District Judge. This is an action at law, demanding the proceeds obtained from certain ores alleged to have belonged to the plaintiff, and to have been taken without right by the defendant. Trial by jury was waived by stipulation, and the cause was heard by the court. The method of treatment may be novel, but it is hoped that it may be deemed excusable in the circumstances. The case has been on the docket nearly eight years, and its vicissitudes have been unusual. After the trial last fall, which covered practically a week, and was devoted to oral testimony and the introduction of depositions taken in the West, with many maps attached thereto, time was allotted the counsel for filing briefs. The original briefs were delayed, but finally appeared. Then followed a fusillade of replies and counter replies, until the court became satisfied that the subject was exhausted. It is believed that the court thoroughly appreciates the issues, but time forbids such analysis of the situation as that what shall be said can be accurately divided into conclusions of fact and conclusions of law. The views of the court both upon fact and upon law will be obvious, it is thought, when the following has been examined:

The Goodenough mining claim was located by the Schefferlin brothers and Richard Gird in the Tombstone district, in Arizona, on March 28, 1878. The laws of the United States and all local rules and regulations were complied with. Next easterly of the Goodenough lies the Hawkeye-Little Wonder claim, and then comes the Empire. The Goodenough was laid out, running 1,500 feet in an easterly and westerly direction; the northerly and southerly lines being parallel and about 458 feet apart. The plaintiff is the legal owner of the Empire claim, and the defendant is the legal owner of the Goodenough. The initial monument used by the locators was a post, with a tin can attached, and was placed at or near the Goodenough outcrop, and was still there shortly before the hearing, although the outcrop had been removed by the operations of mining. At the time of the location there were, in plain view upon the surface of the ground, just northerly of the Toughnut claim, three outcrops of ore. Upon plaintiff's map, Exhibit S, used at the hearing, they are marked, "Goodenough, Way-Up Vein, and Combination Outcrops." Toward the south the lines of the Toughnut claim stared the locators in the face, but they were free-handed toward the north. Section 2320, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1424], said, "No claim shall extend more than 300 feet on each side of the middle of the vein at the surface, nor," etc. They were obliged to assume that some place on the earth's surface represented the middle of the vein, and from that point they could measure no further northerly than the distance southerly to the Toughnut line. They placed that point at about the middle of the manifestation of ore

at the Way-Up outcrop, and measured off a distance toward the north equal to the distance to the Toughnut on the south. They placed their monument on what seemed to them to be the first appearance of the vein toward the east, and extended the claim far enough to the west to include the Combination outcrop, which might have been another manifestation of the vein. In their description of the claim they speak of crossing the vein with its easterly and westerly lines. From our present knowledge, it is doubtful whether the Combination outcrop is a part of the actual vein which exploitation has shown that they did locate upon, and it will be wise to eliminate it from our thoughts. It has been referred to because it had an influence upon the westwardly extension of the 1,500 feet of the claim, and for no other reason. There was a vein, lode, or ledge where the ore manifested itself at the Way-Up outcrop, but it happened to run the wrong way. It extended northerly and southerly across the Goodenough claim. It is a true vein, within the meaning of the statute. The courts have so found, and counsel concede it to be so. The contention is that the original location of the Goodenough was not made with reference to that vein. This position counsel for the plaintiff have occupied with consistency for many years, and, to do them justice, it is necessary to delve into the problem more extensively.

The development of the Tombstone district has enabled the expert to reach a pretty accurate conception of its geological formation. It is enough for our purpose to say that the underground workings disclose a series of anticlines and synclines. (The anticline is the crest of a ridge, and the syncline the lower portion.) These folds have been pressed together by some unknown original force. At and near the ground in dispute the ridges extend in an easterly and westerly direction. Across the folds, and substantially at right angles thereto, appear cracks, fissures, and crevices, into which from below saline waters were forced, containing ores in solution; and such waters, upon reaching the limestone, which is especially susceptible to their influences, overflowed, or, as it has been expressed, slopped over, from the crack, fissure, or crevice, and permeated the limestone in irregular shapes—at the point in question, largely to the easterly and somewhat northerly. The only indications upon the Goodenough which come up to the "vein, lode, or ledge" of the statute are found at the Way-Up crack or crevice, which cuts across the claim nearly at right angles; and the ore found in the anticlinal folds connects therewith, and is part of a system of irregular deposits, practically continuous. The original locators mistook the significance of the Goodenough and Way-Up outcrops, and laid out their claim parallel with the vein as they supposed it to exist. In fact, they were following the sloppings of the Way-Up crack as they permeated the limestone along the anticlinals, which could in no sense be dignified into the statutory "vein, lode, or ledge."

The present plaintiffs were forced to meet a similar question in the courts of Arizona in 1883. Among others, the experts now employed took opposite views of the question then. The facts about the original location were at that time the same, of course, as now. It was asserted by the expert witnesses that the claim was laid out upon bodies of ore which appeared in the limestone of the anticlines, and came above

the surface at the two outcrops described herein. They failed to establish the proposition. Now they are obliged to abandon the theory they then sought to establish, and adopt what may be called the "separate ledge theory." If the extensive mineralization and evidences of ore in place in the Way-Up case, contained between shale above and quartzite below, with frequent evidences of defined walls, etc., failed to reach the measure of the statutory vein, lode, or ledge, it is not easy to see how it can be expected that the insignificant results developed from the manifestation at the initial monument can fare any better.

Mr. Church struggled for the limestone ledge theory in the Way-Up case, and now, while still insisting that the claim was laid out upon the supposed limestone ledge running east and west, gravely permits the inference that, because the monument is upon a ledge which by later developments has been shown not to have been actually connected with the rest of the ores which slopped over from the Way-Up crevice, it follows that the locators had that ledge alone in their minds when they laid out the claim. In the same breath he says that the ledge on which the initial monument was placed is in a similar position to the other ores of the limestone, and is part of a system which is "essentially continuous." When the locators took their claim they were not selecting outcrops. They were claiming a location on a vein of which at least two possible manifestations were in sight, both in the blue limestone. Its length was extended in the direction which the outcrops indicated. They are manifestations of the same vein, and that vein has been found to run and does run nearly north and south. The original locators mistook the course of the vein upon which they were claiming, and staked out their claim based upon that misapprehension. This being so, the main point of law arising was settled when the issues raised by the demurrer were decided.

It is unwise to exchange mounts while traversing an extremely dangerous place. In the Way-Up case, Prof. Church would not have contended that the initial monument was on a separate ledge running parallel with the claim, because in such event he could not have maintained his position as to the extralateral rights on the Way-Up crack. The sloppings were then as now, in his view, essentially continuous. His limestone ledge theory was an absolute necessity, but it was equally important to join the location to that limestone ledge.

I am forced to find, as the judge did in the Way-Up case, that there is no ledge apexing in the Goodenough, except the one running north and south, and also find that the ore above ground at the initial monument and Way-Up were manifestations of that ledge.

I have studied with care the testimony of Howe and Staunton taken in the West in 1897. Plaintiffs were represented by counsel, and had every opportunity to probe the facts by personal examination, and to prepare their contention in reply. That evidence was offered by the defendants with two distinct purposes in mind: First, to demonstrate that a vein, lode, or ledge of ore exists running across the Goodenough in a northerly and southerly direction, crossing one or both original side lines. Second, to demonstrate that the workings toward the easterly original end line of the Goodenough are on ore, and are connected with the vein, lode, or ledge above described, and that they continue

on ore at different depths, across the easterly original end line, through the Hawkeye-Little Wonder and into the Empire. The initial monument seems to have been referred to only once. Mr. Howe says that two small circles on defendant's Exhibit No. 5 at the point H mark a point which "shows the location of the post No. 1, or the initial monument from which the official surveys of the Goodenough claim were made." It would seem that, after the depositions had been taken, it was, in the minds of counsel for the plaintiff, indisputable that both contentions had been established. It was therefore settled that the sloppings from the Way-Up crack could be traced on ore into the Empire ground. This situation drove the plaintiff to seek a new entrenchment. It was believed that the ore which found the surface at the point where the initial monument was placed could not be shown to be connected underground with the Way-Up crack. It ran for a little distance east and west, and there vanished. It had defined walls, and would serve for a vein. It was only necessary to establish that the original location was based upon that vein. In such circumstances, it is not easy to understand what reason counsel for the plaintiff has for complaining because certain indicia are absent from defendant's maps which were introduced at the Western depositions. Plaintiff's map Exhibit S gives no very definite pictorial illustration of the facts which Prof. Church presents in connection with the exploration, exploitation, and original assessment work which followed the location of the claim, and my attention is not called to anything more detailed and definite.

The plaintiff states one aspect of the law very fairly:

"All that the locator can do is to find ore, and lay out his claim parallel with the course of the vein as indicated by the surface outcrop, and take what subsequent development shows his location entitles him to."

I accept that doctrine, and act upon it. If the argument as to overlapping claims were in point, the locators could have taken more by going 300 feet northerly from the middle of the Way-Up. Defendant did not need at the outset to waste time in showing connection between the vein located and the vein it attempted to prove. That had been threshed out by plaintiff in the Way-Up case. As counsel say now, the only chance in the Way-Up was to show that the location was on the limestone ledge.

The contention is based primarily upon sections 2320 and 2322:

"Sec. 2320. Mining-claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, heretofore located, shall be governed as to length along the vein or lode by the customs, regulations, and laws in force at the date of their location. A mining-claim located after the tenth day of May, eighteen hundred and seventy-two, whether located by one or more persons, may equal, but shall not exceed, one thousand five hundred feet in length along the vein or lode; but no location of a mining-claim shall be made until the discovery of the vein or lode within the limits of the claim located. No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface, nor shall any claim be limited by any mining regulation to less than twenty-five feet on each side of the middle of the vein at the surface, except where adverse rights existing on the tenth day of May, eighteen hundred and seventy-two, render such limitation necessary. The end-lines of each claim shall be parallel to each other." [U. S. Comp. St. 1901, p. 1424].

"Sec. 2322. The locators of all mining locations heretofore made or which shall hereafter be made, on any mineral vein, lode, or ledge, situated on the

public domain, their heirs and assigns, where no adverse claim exists on the tenth day .of May, eighteen hundred and seventy-two, so long as they comply with the laws of the United States, and with state, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface-lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end-lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. And nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another." [U. S. Comp. St. 1901, p. 1425.]

The decision upon the demurrer to the defendant's answer—(C. C.) 100 Fed. 910—settles the main question, and it is now practically conceded to be the law that if the locators mistook the direction of the vein, lode, or ledge manifested by the outcrops of ore upon the surface, and laid out their claim crosswise instead of lengthwise of the vein, lode, or ledge, then the original side lines of the claim become the legal end lines, and the original end lines become the legal side lines, and the locators shall have the right to follow the vein, lode, or ledge, outcropping within the surface lines of the claim, upon its downward course, if it so far departs from a perpendicular as to carry it underground beyond the legal side lines to a point where it shall be cut off by its legal end lines vertically extended in their own direction perpendicularly. The court has found as a fact that the mistake in location was made. That ends the case, unless some other point arises upon the pleadings and evidence.

Having taken the ground that defendant was a naked trespasser when it took away the ore from underneath the surface lines of the Empire claim, the plaintiff is not so situated as to make use of the principles of estoppel growing out of the contract of January 18, 1894, whether by deed or in pais. For convenience, the contract is inserted here:

"Articles of agreement made this 18th day of January A. D. 1894, between The Tombstone Mill & Mining Company of Connecticut by its General Manager, W. J. Cheyney, party of the first part, and the Empire Milling & Mining Company of Maine, by its President, party of the second part:

"First. That said party of the first part having opened up its mine to within a few feet of the dividing line between the properties of the two companies, affording an opportunity to exploit and develop the Empire mine, the property of the party of the second part, at a cost much less and in a shorter space of time than possible to be done through its own shaft or by any other method now known to the party of the second part and the party of the second part being desirous that the said exploiting and developing be done to the extent possible under an expenditure of ten thousand dollars ($10,-000), the said party of the first part hereby agrees to undertake the said work for and on behalf of the party of the second part, and binds itself to prospect and develop the said Empire mine, using its best knowledge, skill and care, doing all the said work as thoroughly, perfectly and economically as if said work were being done on its own property, to report the result of its work as progress is made, and to complete said work by or before the first day

·of March A. D. 1895, the said party of the second part to have all reasonable facilities afforded it for entering the property and inspecting the work, all for the consideration hereinafter named.

"Second. The party of the second part hereby agrees that the party of the first part shall have the right to repair and use the Empire shaft at its dis-·cretion and it hereby agrees and binds itself to pay to the party of the first part such sums of money as may be called for from time to time, the aggregate not to exceed the sum of ten thousand dollars ($10,000).

"Third. Should any marketable ore be extracted in the course of the aforesaid development it is hereby agreed that the said party of the first part shall sell the same on the same basis as it sells its own ores, accounting to the party of the second part therefor, and, in consideration of the covenants and agreements hereof it is mutually agreed that the party of the first part shall be allotted and paid such equitable portion of the proceeds of sale of said ores as may hereafter be agreed upon between the said parties.

"In witness whereof we have hereunto subscribed our names and affixed ·our seals the day and date before mentioned.

"[Seal.]         The Tombstone Mill & Mining Company.
                  "By W. J. Cheyney, Its General Manager.
"[Seal.]         The Empire Milling & Mining Company
                  "By D. C. Cutler, President.
                  "H. S. Vanderbilt, A. C.,
                       "Empire M. & M. Co."

After entering into that contract, plaintiff paid $7,500 to the defendant, and in the fourth count of his complaint demands it back. The evidence shows that $2,500 was paid back to Mr. Cutler, plaintiff's president. He says that he accepted it as a personal loan, but it was paid by check to his order as president, was intended for the company, and ought to be credited to the defendant by the plaintiff. The balance, $5,000, is accounted for as having been expended on exploitation under the contract. As a matter of fact, it was expended in cutting inclines, drifts, winzes, etc., which either helped the defendant directly in getting at its own ore, or developed workings which might have shown other ore belonging to the defendant if they had not proved barren. On the principle that one cannot "eat his cake and have it," it would be unjust for the defendant to retain that money.

Let judgment be entered for the plaintiff for $5,000, with interest from March 30, 1897, and costs.