WALRATH et al. v. CHAMPION MIN. CO.

(Circuit Court, N. D. California. August 13, 1894.)

1. MINING—EXTRALATERAL RIGHTS—END LINES.
   Under Act 1872 (Rev. St. § 2322), giving one who had theretofore located a vein and received a patent therefor, by which he obtained a right only to that particular vein, and to the surface ground as surveyed as incident merely to the vein, all other veins throughout their entire depth, the apexes of which lay within such surface lines extended downward, his extralateral rights as to such other veins are determined by the original end lines of the location.

2. SAME—ESTOPPEL—STATEMENT IN RELOCATION.
   Where, by reason of an overlap in the N. claim onto the P. claim, a relocation of the N. claim is made, the designation, in the relocation, of a certain line as the north end line of the P. claim, and the express abandonment of all that portion of the N. claim, for surface and lode, lying south of such line, do not estop the owner of the N. claim to deny that such line is an end line of the P. claim for the purpose of extralateral rights.

**3. SAME—ABANDONMENT.**

The abandonment by the relocation of the N. claim was to any and all lodes within the surface boundaries of the P. location and survey, and it did not give to the P. claim any greater rights than it previously had by virtue of its location and survey.

**4. SAME—STATEMENTS OF SUPERINTENDENT.**

A statement by the superintendent of a mining corporation, made without the scope of his authority, that he would not interfere with or cross a line between its claim and another, is not binding on the corporation.

Action by A. Walrath and others against the Champion Mining Company.

Patrick Reddy and J. F. Smith, for complainants.

Lindley & Eickhoff, Fred Searles, and Geo. T. Hoeffer, for respondent.

HAWLEY, District Judge. This action is of the same character as Consolidated Wyoming Gold Min. Co. v. Champion Min. Co., just decided, 63 Fed. 540, and may be said to be a companion case, as it involves the title to a small segment of mining ground of the "contact" vein situate further south. The Providence mine was located in July, 1857, in conformity with the local rules and regulations of the miners in the mining district where the claim is located. On the 28th of April, 1871, a patent was obtained from the government of the United States for 3,100 linear feet of the Providence lode, and for certain surface ground of irregular shape and form. This patent was issued under the provisions of the act of congress of July, 1866, and the grant was "restricted to one vein, ledge, or lode," and to the surface ground, particularly described by metes and bounds. Complainant derives his title to the Providence lode under said patent as a cotenant. The respondent is the owner of the mining claims and ground known as the "New Year's" and "New Year's Extension." Its right to these claims was acquired subsequent to the act of congress of 1872, and is evidenced by a receipt and certificate of purchase from the United States land office, which is the equivalent of a patent. The original location of the New Year's Extension on its southeasterly side overlapped upon the surface of the Providence mine in the form of a triangle. In 1884, the owners of the Providence objected to this overlap upon their patented ground, and the result of this objection was that the respondent caused a relocation to be made by its superintendent, abandoning such portions of the lode and surface ground as were within the patented surface lines of the Providence. The notice of location of the New Year's Extension, omitting certain portions, reads as follows:

"The lode line of this claim as originally located, and which I hereby relocate, is described as follows: Commencing at a point on the northerly bank of Deer creek, which point is 80 feet S., 11 deg. 45 minutes east, of the mouth of the New Year's tunnel, and running thence along the line of the lode towards the N. E. corner of the Providence mill, about S., 46 deg. 15 minutes east, 200 feet, more or less, to a point and stake on the northerly line of the Providence mine, patented, designated as 'Mineral Lot No. 40,' for the south end of said lode line. * * * And whereas, part of this claim as originally described, and as hereby relocated, conflicts with the rights granted by the letters patent of said Providence mine * * *: Now, therefore, so much of this claim, both for lode and surface ground, as originally designated, conflicted or now conflicts with any portion of the surface or lode

claims or rights granted by said patent is and are hereby abandoned. Which portion of this claim so abandoned is described as follows: All that portion of the above-described New Year's Extension claim, for surface and lode, which lies south of the northern boundary line of said Providence mine, which runs north, 43 deg. 10 min. east, across the S. eastern corner of this claim."

Numerous maps, diagrams, and models were offered by the respective parties. The following diagram is deemed sufficient to illustrate and explain the contention of the respective parties:

## EXHIBIT 3.

The lines a, b, c, d, e, f, g, h, i, k, l, m, n, o, p represent the lines described in the patent of the Providence. The lode line from z to z', running in a northerly and southerly direction, represents the Providence lode, described in the patent. This lode is in granite, and is called the "granite lode." Its dip is to the east. The lode delineated on the diagram and marked x, x' is a separate and independent lode from the granite, and is called by the complainant a "back vein," and by respondent the "contact vein" between slate and granite walls. This lode is the same as was designated in Consolidated Wyoming Gold Min. Co. v. Champion Min. Co. as the "Ural" or "contact" vein. It will be noticed that in its course upon its strike it comes into the New Year's claim across the Ural side line. marked "Wyoming" in the diagram, and passes through the New Year's in a southerly direction to the northerly line of the New Year's Extension, when it changes its direction to a southerly course, and extends through the New Year's Extension and crosses the line f, g, of the Providence surface line, and extends through the Providence ground to the point x, as delineated on the diagram. Its direction beyond that point has not been ascertained, and is entirely problematical, and, as I think, wholly immaterial. If it continues in the same direction, it would cross the line of the Providence between d and f, near the point e; but, for aught that appears in the evidence, it may extend through the Providence ground, and cross the line a, p. Its dip, like the Providence, is to the east. The Providence lode as patented extends northerly about 30 feet across and beyond the line g, h, and about ———— feet southerly beyond the south line a, p, of the surface location. No portion of the surface ground is in dispute. There is no controversy with reference to the Providence lode. The only controversy between the parties is in relation to the "contact" or "back" vein. What portion of this vein, in its downward course, is complainant entitled to? Which line is the northerly end line of the Providence ground, through which the vertical plane is to be drawn downward with reference to the "contact" vein? Complainant claims that the line f, g, on the diagram, is the northerly line of the Providence with reference to this lode, and that this line should be extended to g', and so on indefinitely downward. Respondent claims that the line should be drawn from the point where the lode crosses the southerly line of the New Year's Extension or Annex, covering the same ground from v to v', marked on the diagram as the "line claimed by Champion."

The case was argued ingeniously, with much zeal, force, and ability, upon both sides, and numerous questions of both law and fact were earnestly pressed upon the attention of the court in favor of the respective contentions. Many of the points thus presented were, as in the Consolidated Wyoming Case, novel and new, and all of them were exceedingly interesting, and have received a careful consideration. I shall content myself, however, by stating what is believed to be the proper construction of the statutes of the United States, and announce my conclusion upon the questions involved without attempting to discuss all the legal points advanced by counsel.

As there is no dispute between the parties as to the right of complainant to the Providence lode, it is unnecessary to discuss that question, except so far as it may tend to illustrate or explain the principle that is to be applied to his right to the contact vein. The Providence lode was located, as before stated, prior to the act of 1866, under the rules, regulations, and customs of the miners in the district where the mining claim is situated. The locators were only required to designate the lode in their notice of location. The lode was the principal thing. The surface ground was a mere incident thereto, for the convenient working thereof. The notice of location designated the number of feet that was claimed upon the lode, and the locators were entitled to that number of feet, if allowed by local rules, in whatever direction the lode ran, and to all its dips, spurs, angles, and variations. The subsequent acts of congress did not interfere with these rights, but were in all respects confirmatory thereof. The Eureka Case, 4 Sawy. 323, Fed. Cas. No. 4,548; Wilhelm v. Silvester (Cal.) 35 Pac. 997. The act of 1866 provided a method whereby the owners of mining claims located prior to the passage of the act, who had complied with these local customs, rules, and regulations, might, upon certain conditions, receive a patent therefor from the government of the United States. Parties applying for patents were required, among other things, to "file in the local land office a diagram of the same so extended laterally or otherwise as to conform to the local laws, customs, and rules of miners, and to enter such tract, and receive a patent therefor," etc. Under the act of 1866 parallelism of end lines was not required, but by the act of 1872 parallelism of end lines is made essential. A survey of the surface ground must be made before it can be patented, and the surface lines of such survey should be marked upon the ground, whether patented under the law of 1866 or of 1872. The intent of both acts, in this respect, is substantially to the effect that the mining locations made thereunder should be along the lode lengthwise, and the surface boundaries should be marked upon the claim. It was not intended by either act that the locator would have any right to follow the lode upon its strike beyond the surface lines of his location. The term "location" as used in both acts refers to the surface ground as well as to the vein or lode. The lode claim, whatever its nature, character, or extent, is to be limited to the survey of the surface location, and the title to the lode upon its strike is not given to any portion thereof which departs beyond the surface lines of the location. In Mining Co. v. Tarbet, 98 U. S. 463, familiarly called the "Flagstaff Case," the supreme court of the United States declared that under the act of 1866, as well as under the act of 1872, the location of a mining claim upon a lode or vein should be made along the same lengthwise of the course of its apex at or near the surface, and, in the course of its opinion, said:

"The act of 1872 is more explicit in its terms, but the intent is undoubtedly the same as it respects end lines and side lines and the right to follow the dip outside of the latter. We think that the intent of both statutes is that mining locations on lodes or veins shall be made thereon lengthwise, in the general direction of such veins or lodes on the surface of the earth where they are discoverable; and that the end lines are to cross the lode and extend

perpendicularly downwards, and to be continued in their own direction either way horizontally; and that the right to follow the dip outside of the side lines is based on the hypothesis that the direction of these lines corresponds substantially with the course of the lode or vein at its apex on or near the surface."

See, also, Iron Silver Min. Co. v. Elgin Min., etc., Co., 118 U. S. 208, 6 Sup. Ct. 1177; The Eureka Case, 4 Sawy. 323, Fed. Cas. No. 4,548; McCormick v. Varnes, 2 Utah, 355, 9 Morr. Min. Rep. 505.

The patent to the Providence mine was confined to the Providence lode and to the surface ground as surveyed and marked on the diagram filed in the land office. It granted no right to the owners of the Providence to the "back" vein. It was a grant to the Providence lode only, and in express terms excluded all others. The effect of the act of 1872 was to grant to the owners of the Providence surface location all other "veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, in whatever course or direction they might run." In Wilhelm v. Silvester, 35 Pac. 997, the supreme court of California, in discussing this question, after quoting from section 2322 of the Revised Statutes, said:

"This language is clear and explicit, and in designating the property rights of locators is in no wise ambiguous or uncertain. It expressly, and in language which needs no construction, grants to such locators every ledge or lode the top or apex of which lies within the surface lines of the location; that is, such part of the ledge as lies within such lines. And there is no limitation or exception of any such ledge on account of the direction it may run. It may be parallel with the original discovered ledge, or may approach it at right angles, or at an obtuse angle, or at an acute angle; it may intersect it or not; and still it may be clearly within the language of the said section."

The act of 1872, in granting all other veins that were within the surface lines of previous locations, did not create any new lines for such other veins, nor invest the court with any authority to make new end lines for such other veins. And it is apparent from an examination of the statute that the court has no power to make a new location for every vein that may be found within the surface lines of the location, and thereby enlarge the rights of the original locators. When the end lines of a mining location are once fixed, they bound the extralateral rights to all the lodes that are thereafter found within the surface lines of the location. It necessarily follows that the end lines of the Providence survey must be considered by the court as the end lines of any and all other lodes or veins which lie "inside of such surface lines;" otherwise endless confusion would arise in the construction of the statute. End lines would have to be constructed in different directions if the separate lodes or veins found within the surface lines did not run parallel with each other, and the result would be that these lines extended might give to the owners of the claims a greater length along the lode as it extended downward than they had upon the surface. If the same end lines which bind the extralateral rights of the Providence surface survey apply to the contact vein and to all other veins, if any are hereafter found, then no such difficulty can arise. This is the rule that applies to all locations made after the act of 1872, and it ought not to

be presumed that congress, by its grant to prior locators, intended to give greater rights to them than were given and granted to subsequent locators under the same act.

It is settled by the decision of the supreme court of the United States in Iron Silver Min. Co. v. Elgin Min., etc., Co., that the same end lines bound all extralateral rights as to all veins or lodes within the surface boundaries of the claim. Justice Field, in delivering the opinion of the court, speaking of the rights of locators of mining ground to follow the lode in its depth, said:

"It often happens that the top or apex of more than one vein lies within such surface lines, and the veins may have different courses and dips, yet his right to follow them outside of the side lines of the location must be bound by planes drawn vertically through the same end lines. The planes of the end lines cannot be drawn at right angles to the courses of all the veins if they are not identical."

In the present case the end lines of the Providence—a, p, and g, h —are conceded to be substantially parallel with each other, and that the Providence lode, in its course lengthwise, passes these end lines. Complainant's contention would take the "back" or "contact" vein outside of the plane of the northerly end line of the Providence drawn downward vertically, and give to him extralateral rights not granted by the patent, nor given to him by the granting provisions of the act of 1872. But in this connection it is argued by complainant that respondent is estopped from asserting any claim to any vein or lode lying southerly from the line f, g, because: (1) In its relocation of the New Year's Extension claim it recognized and designated that line as the "northerly end line of the Providence mine," and expressly abandoned all that portion of the original New Year's Extension claim "for surface and lode which lies south of the northern boundary line of said Providence mine, which runs north, 43 deg. 10 min. east, across the S. eastern corner of this claim." (2) Testimony was offered, and admitted, against the objection of respondent, tending to show a further estoppel, which was to the effect that before the Champion shaft was started the plans therefor were submitted, by the then superintendent, to the board of directors of respondent, and approved by it, and that the shaft was sunk, in pursuance of such plans, parallel with the line f, g, extended in the direction of g'; and that the superintendent had conversations about that time with complainant and his brother, a co-owner in the Providence, and stated that he would never interfere with that line, and would never cross it, and that this line was practically agreed upon by them at that time as the boundary line between the two claims. This testimony, giving it full scope and effect, is not sufficient to create an equitable estoppel. The corporation is not bound by such declarations of its superintendent, made without the scope of his agency or authority from the corporation. If respondent was given the line for which it contends, it would take that portion of the lode which it expressly abandoned by its relocation. The abandonment, which is binding upon it, was to any and all lodes within the surface boundaries of the Providence location and survey; but this abandonment or agreement, or whatever it may be called, did not give to the

Providence any greater rights than it previously had. The acquiescence and agreement between the parties amounted to nothing more than a recognition of both parties that the line f, g, was the boundary line between the two companies. There is nothing in the facts of this case which gives to complainant any right to extend that line, as a boundary line, any further than to point g, at which point it comes to the line g, h, which, as before stated, is the northerly end line of the Providence surface location, and beyond which, in a vertical line drawn downward, the complainant has no right to any part or portion of the "back" vein, either by virtue of the Providence location, patent, act of 1872, or any agreement or estoppel between the parties. Let a decree be drawn designating the boundary plane fixing the rights of the parties in conformity with the views expressed in this opinion, for a perpetual injunction, and for an accounting, if so desired; each party to pay their own costs.