## COSMOPOLITAN MIN. CO. v. FOOTE et al.

(Circuit Court, D. Nevada. April 23, 1900.)

### No. 684.

**MINING CLAIMS—MISTAKE IN LOCATION—EXTRALATERAL RIGHTS.**

Where by mistake a mining claim is located across, instead of along, the vein passing through the location point, the rights of the locator are governed by the facts as they exist with regard to such vein. His side lines, as located, become end lines, and he is not entitled to any extralateral rights thereunder, although another vein, extending transversely to the one intended to be located, may have its apex inside of such surface lines.

In Equity. Suit to determine rights of owners of adjoining mining claims.

W. E. F. Deal, for complainant.
Torreyson & Summerfield, for defendants.

HAWLEY, District Judge. Complainant is the owner of the Cosmopolitan patented mining claim, 1,000 feet in length and 600 feet in width, situate in Gold Hill mining district, Storey county, Nev. The patent was issued in October, 1873. Defendant Lottie Foote is the owner of a mining claim and location situate in the same mining district, immediately west of the Cosmopolitan, and called the "Badger." There is no controversy in relation to the surface lines of the Cosmopolitan claim. The complainant claims that there is a lode bearing mineral in the Cosmopolitan claim near its westerly side line, having a northerly and southerly course, with a dip to the east, and that the apex of this lode is within the Cosmopolitan surface location, except for a distance of a few feet, where a very small part of it extends over the surface line into the

Badger from 5 to 15 feet, more or less. The lode, as claimed by complainant, is in two branches at the southerly end, each branch being from 30 to 50 feet wide, and which, going north, unite in one vein, from 60 to 100, or more, feet wide. The defendants claim that there is a lode near the east side line of the Badger, having its course north and south along the entire length, with a hanging and foot wall, wholly within the Badger surface lines. The contest between the parties is in relation to the apex of the respective lodes, and upon that question a mass of evidence has been submitted by the respective parties. There is a decided conflict in the evidence upon this point.

In the year 1875 some work was done by the complainant in running an upper and lower tunnel into the Cosmopolitan ground. The mouth of the upper tunnel commenced near a point where a blacksmith shop was afterwards erected, about 100 feet southwesterly from the southwest corner of the Cosmopolitan claim. This tunnel runs in a northeasterly direction a distance of about 400 feet through the Cosmopolitan claim. At a point about 100 feet from its face the tunnel makes a turn, and runs more in a northwesterly direction. This tunnel was constructed by the complainant. Leases and licenses were at different times from 1894 to 1898 given to different parties to work therein and take ore therefrom. The rails in the tunnel, and cars to convey the ore, were supplied and paid for by the complainant. During the years 1895 and 1896 the Footes, father and sons, made several applications to Mr. Landers, the president of the Cosmopolitan Company, for the privilege of taking ore out of the Cosmopolitan claim through this tunnel. None was ever given them. Mr. Staricha in 1895, under a lease from complainant, extended the tunnel and took out ore from the stope called the "Staricha Stope," distant about 100 feet from the southerly line of the Cosmopolitan mine. In 1896 an incline from this stope was opened out to the surface, and came out near to, but west of, the westerly line of the Cosmopolitan claim. Around this stope and incline, and the character of the earth, rock, and other material found therein, cluster the most important facts upon which each of the parties relies to prove where the apex is found. In 1898 the defendants entered into the tunnel, took possession thereof, and excluded complainant therefrom, and at or near the face thereof stoped out a large quantity of ore, and were so engaged at the time of the commencement of this suit, and continued to work thereon for some time thereafter. At the trial the contention of the defendants was that the ore thus taken out belongs to a lode which has its apex within the surface lines of the Badger claim, and that they have the right to follow said lode in its downward course into the Cosmopolitan ground, although there may have been a mistake made in locating the ledge.

The Badger is a relocation, made in 1884. The notice of relocation reads as follows:

"Location Notice. Badger Mine.

"Notice is hereby given that I, the undersigned, have this day relocated 1,000 feet of the south end of the Badger mine & 500 feet of the north end of the

.Margarita mine, in Storey county, Nevada, for mining purposes. This location is made subject to the mining laws of the United States and the state of Nevada. My residence is Silver City, Lyon county, Nevada, and am a citizen thereof. The said mine is situated in Negro ravine, adjoining the Flora Temple on the north, and west of the Cosmopolitan mines. July 14th, 1884. This claim shall be known as the 'Badger Mine.'          George Foote."

At the time this location notice was posted there was a lode exposed within the surface lines of the location, running in an easterly and westerly direction. The rights of the defendants are based solely upon this relocation. If it was made upon a lode running in an easterly and westerly direction, then the side lines marked on the surface as such would become, in the eye of the law, the end lines of the location, and the end lines marked on the surface would become the side lines of the claim. The testimony concerning the relocation is very meager. Mr. Foote testified: That he made the relocation on a lode running in a northerly and southerly direction. That he placed the location notice at or near the center of the surface claim, and at a point marked "O" on the map. That ore was disclosed at that point. That there was a hole dug about 350 feet northerly from that point, which disclosed ore, and another one at a point about 750 feet southerly from the location point. At the point of location there is a cut 6 or 7 feet long, 2 feet wide, and 1 foot deep in vein matter. The hole towards the north line of the Badger is an opening 5 feet wide and 15 feet in length, in which ore is exposed. The hole towards the southern line of the Badger is 2 feet square and 1 foot deep, and is in solid country rock. The testimony in rebuttal was to the effect that the character of the ground between the hole at the north and the location point was in solid country rock. The witness Wrinkle said: Part of the country "is covered by surface dirt, but quite a large stretch is exposed, and it is solid country rock." The same is true of the ground between the location point and the hole at the southerly end of the claim. The witness said, "Wherever the ground is laid bare,—no surface dirt covering it,—it is nothing but country rock." The same witness, speaking with reference to the explorations in the Badger tunnel, testified as follows:

"Q. State whether or not any other vein appears in that tunnel, except the one that you have shown on the map,—any vein running northerly and southerly. A. No; there is not. * * * Q. State whether or not any vein running northerly or southerly is shown in that tunnel. A. No. Q. What indications are there, if any, on the surface between the opening shown to you near the north line, 200 feet from it, and the location point, or the location point and the opening 150 feet or so from the south line of the Badger,—what indication between those points of any vein whatever? A. There are none."

There are surrounding circumstances in connection with the testimony upon this point as to the course of the lode that ought not to be overlooked. No attempt was made upon the part of the defendants, except by the testimony of Mr. Foote, to establish the fact of the existence of any lode running northerly and southerly from the location point, which was and is of as much importance as the establishment of the existence of a lode running in that direction near the easterly line of the Badger claim. There is no pretense that the relocation was made upon the lode in dispute at the easterly

line of the Badger location, or that there is any possible connection between that lode and the one located by Mr. Foote. The defendants' contention seems to be that because, as they claim, they have subsequently discovered the apex of a lode running northerly and southerly at the easterly line of their surface location, they have a right to follow that lode in its dip underneath the Cosmopolitan claim, without any regard to the direction or course of the lode located by Foote. But that right, in law, depends upon the fact whether what are marked on the ground as the side lines of the location are in fact the side lines; and to determine that question we must look exclusively to the location, and find out what the defendant Foote located, because, if he located upon a lode that he thought had a northerly and southerly course, and made his relocation accordingly, and the subsequent developments proved that the locator was mistaken in the course of the lode, he would be bound by his own mistake, and governed and controlled in his rights by the facts as they are shown to exist, instead of what he thought existed at the time the location was made. The testimony given by the locator is wholly insufficient to show that any lode, ledge, or vein had been discovered by him, or the prior locators of the ground, having a northerly or southerly course at the point of location. When the entire testimony is taken into consideration, it is made manifest that no such ledge exists, or at least that none has ever been discovered. The point of the relocation where the notice was posted was near to a well-defined lode, called by some of the witnesses the 'Badger,' and by others the 'Margarita,' which has a course clearly defined in an easterly and westerly direction, and upon which the Footes have been at work for years. No claim that his location was made upon a lode running north and south seems ever to have been made by the locator prior to the time of the trial, nor until after complainants' counsel had publicly stated that the relocation of the Badger was made upon a lode running east and west, and that the locator's side lines would be his end lines, and cut off his extralateral rights in that direction. Foote testified that he had never informed his counsel to that effect, nor had he given any such information to the surveyor employed by the defendants. But, whatever his claim may have been,—whatever his intentions were,— the fact remains that the relocation was absolutely made upon a lode which runs more east and west than north and south; and the law steps in and declares that his legal rights under this location must be determined by calling what he marked as the side lines the end lines of his location. This being true, it follows that he is not entitled to any extralateral rights beyond his end line along the western side line of the Cosmopolitan. The law upon this point is well settled. The principles which govern and control this question were first announced by the supreme court in Mining Co. v. Tarbet, 98 U. S. 463, 25 L. Ed. 253, affirmed in Argentine Min. Co. v. Terrible Min. Co., 122 U. S. 478, 485, 7 Sup. Ct. 1356, 30 L. Ed. 1140, and followed in Del Monte Co. v. Last Chance Co., 171 U. S. 55, 86, 89, 18 Sup. Ct. 895, 43 L. Ed. 72, and Walrath v. Mining Co., 171 U. S. 293, 307, 18 Sup. Ct. 909, 43 L. Ed. 170. See, also, Iron

Silver Min. Co. v. Elgin Mining & Smelting Co., 118 U. S. 196, 208, 6 Sup. Ct. 1177, 30 L. Ed. 98; King v. Mining Co., 152 U. S. 222, 228, 14 Sup. Ct. 510, 38 L. Ed. 419; Wyoming Min. Co. v. Champion Min. Co. (C. C.) 63 Fed. 540, 548; Walrath v. Mining Co. (C. C.) 63 Fed. 552, 557; 2 Lindl. Mines, § 586 et seq. Numerous other authorities will be found cited in the cases here referred to. .

In Argentine Min. Co. v. Terrible Min. Co., supra, the court, in discussing this question, said:

"When, therefore, a mining claim crosses the course of the lode or vein, instead of being 'along the vein or lode,' the end lines are those which measure the width of the claim as it crosses the lode. Such is evidently the meaning of the statute. The side lines are those which measure the extent of the claim on each side of the middle of the vein at the surface. Such is the purport of the decision in Mining Co. v. Tarbet, 98 U. S. 463, 25 L. Ed. 253. The court there said, referring to the statute of 1866 (14 Stat. 251) and that of 1872 (17 Stat. 91): 'We think that the intent of both statutes is that mining locations on lodes or veins shall be made thereon lengthwise, in the general direction of such veins or lodes on the surface of the earth where they are discoverable, and that the end lines are to cross the lode and extend perpendicularly downward, and to be continued in their own direction either way horizontally, and that the right to follow the dip outside of the side lines is based on the hypothesis that the direction of these lines corresponds substantially with the course of the lode or vein at its apex on or near the surface. It was not the intent of the law to allow a person to make his location crosswise of the vein, so that the side lines shall cross it, and thereby give him the right to follow the strike of the vein outside of his side lines. That would subvert the whole system sought to be established by the law. If he does locate his claim in that way, his rights must be subordinated to the rights of those who have properly located on the lode.' And again that the end lines of the claim, properly so called, are 'those which are crosswise of the general course of the vein on the surface.' Such being the law, the lines which separate the location of the plaintiff below from the locations of the defendant are end lines, across which, as they are extended downward vertically, the defendant cannot follow a vein, even if its apex or outcropping is within its surface boundaries, and, as a consequence, could not touch the premises in dispute, which are conceded to be outside of those lines, and outside of vertical planes drawn downward through them."

In Wyoming Min. Co. v. Champion Min. Co. (C. C.) 63 Fed. 540, 548, I said:

"The statute should be so construed as to give to the locator what he actually locates,—no more and no less. * * * He is admonished by the law that he will be limited in the length of his lode upon its strike to such portion as is within the surface lines of his location, but he is at the same time assured that he will not be limited or deprived of his extralateral rights as to the depth of such lode, upon its dip, the apex of which is within the surface lines of his location. The statute of 1872 gives to locators of mining claims 'the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes and ledges, throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations.' These are their extralateral rights, which should neither be extended nor restricted by the courts. * * * One general principle should pervade and control the various conditions found to exist in different locations, and its guiding star should be to preserve in all cases the essential right given by the statute to follow the lode upon its dip, as well as upon its strike, to so much thereof as its apex is found within the surface lines of the location. If the lode runs more nearly parallel with the end lines than with the side lines as marked on the ground as such, then the

end lines of the location must be considered by the courts as the side lines meant by the statute. If the lode runs more nearly parallel with the side lines than the end lines, then the end lines, as marked on the ground, are considered by the court as the end lines of the location. In both cases the extralateral rights are preserved and maintained as defined in the statute."

Still more directly in point are the views expressed by myself in Walrath v. Mining Co. (C. C.) 63 Fed. 552, 557:

"The act of 1872, in granting all other veins that were within the surface lines of previous locations, did not create any new lines for such other veins, nor invest the court with any authority to make new end lines for such other veins. And it is apparent from an examination of the statute that the court has no power to make a new location for every vein that may be found within the surface lines of the location, and thereby enlarge the rights of the original locators. When the end lines of a mining location are once fixed, they bound the extralateral rights to all the lodes that are thereafter found within the surface lines of the location. It necessarily follows that the end lines of the Providence [Badger] survey must be considered by the court as the end lines of any and all other lodes or veins which lie 'inside of such surface lines'; otherwise, endless confusion would arise in the construction of the statute. End lines would have to be constructed in different directions if the separate lodes or veins found within the surface lines did not run parallel with each other, and the result would be that these lines, extended, might give to the owner of the claims a greater length along the lode as it extended downward than they had upon the surface."

These views are conclusive as to the present controversy between the parties. They apply as well to the "dumping ground" claimed by the complainant as to the lode within the surface boundaries of the Cosmopolitan claim. The owner or owners of the Badger claim, under the location made by Mr. Foote, can only claim 300 feet on each side of the middle of the lode located by him; and, as thus limited, it does not reach any part or portion of the dumping ground of the Cosmopolitan Company. They are, of course, entitled to all lodes, ledges, veins, and deposits of mineral-bearing rock, earth, or ore, the apex of which is found within the limits of the Badger location as herein defined, but they are confined in such rights to the end line drawn downward vertically along the westerly side line of the Cosmopolitan claim. Beyond that they have no right to go.

In the light of these conclusions, it is unnecessary for the court to travel over the surface ground, pass through the tunnels, go up the stopes or down into the winzes, through the drifts and into the cuts and holes, visit the dump, or inspect the croppings, and then test and weigh the credibility, strength, and reasonableness of the testimony of the various witnesses by legal scales, for the purpose of determining the mooted question as to the existence or non-existence of a lode having its apex within the surface lines of the Badger claim west of and near to the Cosmopolitan westerly side line. Let a decree be entered in favor of complainant.