**NORTHPORT SMELTING & REFINING CO. v. LONE PINE-SURPRISE. CONSOL. MINES CO.**

(District Court, E. D. Washington, N. D. November 3, 1920.)

No. 3255.

1. **Mines and minerals** ⊛=31(2)—**End and side lines of lode claims determined by course of discovery vein.**

    The end and side lines of a lode mining claim are not necessarily those so designated by the locator; but the "end lines" are those which are crosswise of the general course of the discovery vein on the surface, although they may have been located as the side lines.

    [Ed. Note.—For other definitions, see Words and Phrases, End Line.]

2. **Mines and minerals** ⊛=31(2)—**End lines of lode claim, for all extralateral purposes, fixed by course of discovery vein.**

    Although Rev. St. § 2322 (Comp. St. § 4618), gives the locator of a lode claim the right to all the veins which apex within its surface, the end lines of the claim, which fix extralateral rights in all such claims, are determined by the course of the discovery vein.

⊛=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

In Equity. Suit by the Northport Smelting & Refining Company against the Lone Pine-Surprise Consolidated Mines Company. Decree for defendant.

John P. Gray, of Cœur d'Alene, Idaho, and John H. Wourms, of Wallace, Idaho, for plaintiff.

William E. Colby, of San Francisco, Cal., and Fred S. Duggan, of Spokane, Wash., for defendant.

RUDKIN, District Judge. This is a suit to quiet title, for an injunction, and for an accounting. The property involved is the segment of a vein or lode, bearing gold and silver, within the surface boundaries of the Last Chance lode mining claim in the Republic mining district. It appears from the bill of complaint that on the 28th day of February, 1896, the predecessor in interest of the plaintiff discovered a vein or lode bearing gold and silver and other valuable minerals and metals on vacant, unoccupied public land of the United States, in what is now Ferry county, in this state; that on the same day they located the Lone Pine quartz lode mining claim, by posting the usual notice at the point of discovery, and sunk a discovery shaft on the lode, disclosing a vein of quartz ore with one well-defined wall; that they immediately marked the location on the ground as required by law, and thereafter continued in the open, notorious, and uninterrupted possession thereof; that they made application for patent in 1897, final proof and payment February 8, 1898, and received a patent under date of March 2, 1899; that on the 19th day of July, 1916, the plaintiff succeeded to the right and title of the original locators, by mesne conveyances, and is now the owner of the claim, and of all veins, lodes, or ledges having their apices therein throughout their entire depth; that subsequent to the 29th day of February, 1896, the predecessors in interest of the defendant located the Last Chance lode mining claim, lying east of the Lone Pine claim, and received a patent therefor under date of March 2, 1899; that within the Lone Pine claim is a vein or lode of quartz bearing gold and silver and other valuable minerals and metals, known as the Blacktail vein; that the top or apex of the Blacktail vein crosses the southerly end line of the Lone Pine claim, and extends in a northerly and easterly direction through the claim, passing out of the east side line at a point 618 feet north of the southeast corner; that the course of the vein is easterly on its downward course, and the plaintiff is the owner of the vein throughout its entire depth between planes, drawn downward vertically, from the south end line and the point where the vein crosses the east side line; that the defendant claims an estate or interest therein, and through secret underground works has extracted ore therefrom to the value of $100,000.

The answer puts in issue the right and title of the plaintiff. The following rough sketch will illustrate, in a general way, the location of the different claims, and the course or strike of the different veins found therein:

The plaintiff contends that the vein designated on the plat as Lone Pine No. 2 is an extension or continuation of the Blacktail vein; that the Blacktail vein enters the south end line of the Lone Pine claim, and passes out through the easterly side line; that the downward course or dip of the vein is in an easterly direction; and that the plaintiff is therefore the owner of the vein or segment in dispute throughout its entire depth. The defendant, on the other hand, contends: First, that the discovery vein crosses both side lines of the Lone Pine claim; that the side lines, therefore, become the end lines, and that the end lines thus established remain the end lines for all purposes, and determine

the question of extralateral rights on all veins found within the surface boundaries; second, that Lone Pine vein No. 2 is not an extension or continuation of the Blacktail vein, and does not pass or cross beyond the south end line of the claim; third, conceding that the Blacktail vein crosses both the south end line and the east side line, the plaintiff is nevertheless attempting to pursue the vein on its course or strike, and not on its downward course or dip.

[1] It is well settled that the end lines fix the limits beyond which the locator may not go in the appropriation of any vein or veins along their course or strike, but within the meaning of this rule the end lines are not always those fixed or adopted by the locator. As said by the Supreme Court in Del Monte Mining Co. v. Last Chance Mining Co., 171 U. S. 55, 89, 18 Sup. Ct. 895, 908 (43 L. Ed. 72):

"Our conclusions may be summed up in these propositions: First, the location as made on the surface by the locator determines the extent of rights below the surface. Second, the end lines, as he marks them on the surface, with the single exception hereinafter noticed, place the limits beyond which he may not go in the appropriation of any vein or veins along their course or strike. Third, every vein 'the top or apex of which lies inside of such surface lines extended downward vertically' becomes his by virtue of his location, and he may pursue it to any depth beyond his vertical side lines, although in so doing he enters beneath the surface of some other proprietor. Fourth, the only exception to the rule that the end lines of the location as the locator places them establish the limits beyond which he may not go in the appropriation 'of a vein on its course or strike is where it is developed that in fact the location has been placed, not along, but across, the course of the vein. In such case the law declares that those which the locator called his side lines are his end lines, and those which he called end lines are in fact side lines, and this upon the proposition that it was the intent of Congress to give to the locator only so many feet of the length of the vein, that length to be bounded by the lines which the locator has established of his location."

Or, as said by Mr. Justice Miller, in his charge to the jury in Stevens v. Williams, 1 McCrary, 480, 490, Fed. Cas. No. 13,413:

"The plaintiff is not bound to lay his side lines perfectly parallel with the course or strike of the lode so as to cover it exactly. His location may be made one way or the other, and it may so run that he crosses it the other way. In such event his end lines become his side lines, and he can only pursue it to his side lines vertically extended, as though they were his end lines; but if he happens to strike out diagonally as far as his side lines include the apex, so far he can pursue it laterally."

And in Walrath v. Champion Mining Co., 171 U. S. 293, 307, 18 Sup. Ct. 909, 915 (43 L. Ed. 170), after quoting the language of Mr. Justice Field in Iron Silver Mining Co. v. Elgin Mining Co., 118 U. S. 196, 198, 6 Sup. Ct. 1177 (30 L. Ed. 98), the court said:

"The court, however, did not mean that the end lines, called such by the locator, were the true end lines, but those which 'are crosswise of the general course of the vein on the surface.'"

It is equally well settled that end lines, once established, cannot thereafter be changed, or, as said by the Circuit Court of Appeals for this circuit in St. Louis Min. & Mill Co. v. Montana Min. Co., 104 Fed. 664, 44 C. C. A. 120, 56 L. R. A. 725:

"As to the first contention, it is a well-settled proposition that a mining claim can have but two end lines, and that, end lines having been once established, they become the end lines for all veins found within the surface boundaries."

[2] It was conceded at the trial, or at all events there is no controversy over the fact, that the strike of the discovery vein on the Lone Pine claim is substantially parallel to the end lines of the claim, and that the discovery vein passes out through and beyond both side lines. Under these facts, had the present controversy arisen under the act of 1866 (14 Stat. 251), extralateral rights would unquestionably be limited by the side lines, and not by the end lines, for under that act the grant was limited to the discovery vein or lode and was likewise limited by the surface boundaries. As said in Walrath v. Champion Mining Co. (C. C.) 63 Fed. 552, 556:

"The locators were only required to designate the lode in their notice of location. The lode was the principal thing. The surface ground was a mere incident thereto, for the convenient working thereof."

The act of 1872 (17 Stat. 91), carried into the Revised Statutes as section 2322 (Comp. St. § 4618), made certain changes in the act of 1866, and extended the grant to the exclusive right of possession and enjoyment in the locator of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of the surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of the surface location. But did this change in the law work any change in the existing rule as to end lines and side lines, or as to the mode or manner of their ascertainment? It would seem not. Thus, in Walrath v. Champion Mining Co. (C. C.) 63 Fed. 552, Judge Hawley said:

"The act of 1872, in granting all other veins that were within the surface lines of previous locations, did not create any new lines for such other veins, nor invest the court with any authority to make new end lines for such other veins; and it is apparent from an examination of the statute that the court has no power to make a new location for every vein that may be found within the surface lines of the location, and thereby enlarge the rights of the original locators. When the end lines of a mining location are once fixed, they bound the extralateral rights to all the lodes that are thereafter found within the surface lines of the location."

The decree in this case was modified in one unimportant particular by the Circuit Court of Appeals (72 Fed. 978, 19 C. C. A. 323), and affirmed by the Supreme Court of the United States (171 U. S. 293, 18 Sup. Ct. 909, 43 L. Ed. 170), under the same title. This language of Judge Hawley was quoted with approval by Judge Gilbert in Montana Mining Co. v. St. Louis Min. & Mill Co., 102 Fed. 430, 42 C. C. A. 415. In that case the court said:

"It is earnestly contended that the complaint does not state a cause of action, for the reason that it appears therefrom that the vein which the defendant in error claims the right to pursue under the surface so conveyed to the plaintiff in error is not the discovery vein, and that there is no allegation that the discovery vein runs in any particular direction, or that its strike would intersect the end lines, or that it runs lengthwise of the claim, rather

than across, or that it dips in any given direction, and that for want of these allegations the complaint wholly fails to show a right in the defendant in error to pursue beyond its vertical side lines the vein from which the ores in controversy were taken."

The learned judge did not question the correctness of the proposition that extralateral rights on all veins within the surface boundaries are controlled by the course or strike of the discovery vein, but proceeded to show that the complaint contained the further distinct allegation that the defendant in error was the owner of the vein from which the ores in controversy were extracted, and therefore stated a cause of action and was sufficient to support the judgment.

In the leading case of Mining Co. v. Tarbet, 98 U. S. 463, 25 L. Ed. 253, after a reference to the act of 1866, Mr. Justice Bradley said:

"The act of 1872 (17 Stat. 91) is more explicit in its terms; but the intent is undoubtedly the same, as it respects end lines and side lines, and the right to follow the dip outside of the latter. We think that the intent of both statutes is that mining locations on lodes or veins shall be made thereon lengthwise, in the general direction of such veins or lodes on the surface of the earth where they are discoverable; that the end lines are to cross the lode and extend perpendicularly downwards, and to be continued in their own direction either way horizontally; and that the right to follow the dip outside of the side lines is based on the hypothesis that the direction of · these lines corresponds substantially with the course of the lode or vein at its apex on or near the surface. It was not the intent of the law to allow a person to make his location crosswise of a vein so that the side lines shall cross it, and thereby give him the right to follow the strike of the vein outside of his side lines. That would subvert the whole system sought to be established by the law. If he does locate his claim in that way, his rights must be subordinated to the rights of those who have properly located on the lode. Their right to follow the dip outside of their side lines cannot be interfered with by him. His right to the lode only extends to so much of the lode as his claim covers. If he has located crosswise of the lode, and his claim is only 100 feet wide, that 100 feet is all he has a right to. This we consider to be the law as to locations on lodes or veins.

"The location of the plaintiff in error is thus laid across the Titus lode, that is to say, across the course of its apex at or near the surface; and the side lines of the location are really the end lines of the claim, considering the direction or course of the lode at the surface."

In Walrath v. Champion Mining Co., 171 U. S. 293, 18 Sup. Ct. 909, 43 L. Ed. 170, the Supreme Court said:

"Appellant's right upon the Contact vein is given by this statute. What limits this right extralaterally? The statute says vertical planes drawn downward through the end lines of the location. What end lines? Those of and as determined by the original location and lode, the Circuit Court of Appeals decided. Those determined by the direction of the newly discovered lodes, regardless whether they were originally intended as end lines or side lines, the appellant, as we have seen, contends. The Court of Appeals was right. Against the contention of the appellant the letter and spirit of the statute oppose, and against it the decisions of this court also oppose.

"The language of the statute is that the 'outside parts' of the veins or lodes 'shall be confined to such portions thereof as lie between vertical planes drawn downwards * * * through the end lines of their locations. * * *'"

Counsel for plaintiff call attention to the fact that there was in that case but one original vein and that the claim was located under the act of 1866. True, the claim was located under the act of 1866; but it is

equally true that the court was construing the act of 1872, for, after quoting section 3 of that act (Comp. St. § 4618), the court said:

"Appellant's right upon the Contact vein is given by this statute."

Furthermore, in an earlier part of the same opinion, the court quoted with approval the language of Mr. Justice Bradley in the Tarbet Case, to the effect that the intent of the two acts with reference to end lines and side lines is one and the same. In the same opinion the court makes use of the following language, upon which the plaintiff apparently places much reliance:

"These propositions we affirm, with the addition that the end lines of the original veins shall be the end lines of all the veins found within the surface boundaries."

It is argued that the court here had reference to original veins within the surface boundaries of a single claim, but this argument seems rather tenuous and far-fetched. If all veins within the surface boundaries had in fact the same end lines or side lines, or paralleled each other, no question could arise as to extralateral rights, because such rights would be the same, whether one or another vein was controlling. If, on the other hand, one vein crossed the side lines and another the end lines, as is the claim here, the statement would seem meaningless and contradictory, because the original veins could have no common side lines or end lines. The statement, however, follows the quotation of the summary of Mr. Justice Brewer in the Del Monte Case, and, inasmuch as the learned judge there referred throughout to a single vein or lode, I am of opinion that the statement was added for the purpose of making clear the proposition that extralateral rights on all veins are controlled by the same set of end lines.

The terms "principal," "original," "primary," "secondary," "accidental," and "incidental" have all been employed at different times to describe the different veins found within the same surface boundaries, but their meaning is not entirely clear in all cases. They may refer to the relative importance or value of the different veins, or to their relations to each other; they may refer to the time of discovery; or they may well be used to distinguish between the discovery vein and other veins within the same surface boundaries, and beyond question they are most frequently used in this latter sense. Thus, in an earlier part of the opinion in the Walrath Case, the Supreme Court refers to "the original location or lode," and in a later part to the strike or dip of "the original vein." In the first instance, the court seems without doubt to refer to the discovery vein because it speaks of "the original location or lode," and there is nothing in the context to indicate that the word was used in any different sense in other parts of the same opinion.

But the chief reliance of the plaintiff is the decision of the District Court in Clark-Montana R. Co. v. Butte & Superior Copper Co., 233 Fed. 547. It appears from the map or plat found in the opinion in that case that the Jersey Blue vein crosses the west end line of the Blackrock claim, and that the Rainbow, or discovery, vein crosses both side lines of the same claim. The court held that extralateral rights were

controlled by the course or strike of the Jersey Blue vein, rather than by the course or strike of the discovery vein, merely saying:

"Neither the Jersey Blue nor the Rainbow is a secondary vein. Both are primary. The Jersey Blue overlaps the Rainbow. Extralateral rights based on it extend east beyond where the like rights based on the Rainbow begin. Indeed, taking the course of the Jersey Blue, where fixed by plaintiff south of the Rainbow, it is probable it crosses the Blackrock south side line east of the Elm Orlu east end line. That the Rainbow crosses both side lines is not controlling. There can be but one set of end lines, and, if the located end lines fix extralateral rights upon one vein, as they do upon the Jersey Blue, they fix them upon all veins."

Ordinarily, I would feel constrained to defer to the superior knowledge and experience of the learned judge who wrote that opinion, in matters of this kind; but, if the question here involved was at all decisive of the rights of the parties in that case, I confess I cannot understand why it should receive such scant consideration at the hands of the court in a well-considered opinion, or why the question was not even referred to by either of the appellate courts to which the case was carried. 248 Fed. 609, 160 C. C. A. 509, 249 U. S. 12, 39 Sup. Ct. 231, 63 L. Ed. 447, where the title of the case is reversed. The decision itself is out of harmony with the language of the courts in the many extralateral right cases decided during the last half century. In all of these cases it seems to have been taken for granted, if not decided, that the principal effect of the act of 1872 was to extend the grant, so as to include all veins or lodes having their top or apex within the surface boundaries, but with the same end lines, the same side lines, and the same extralateral rights as properly appertain to the discovery vein, which forms the basis of the location and patent.

Counsel for plaintiff concede that the course or strike of other veins have no controlling effect, unless their presence was known at the time of location; but the testimony in this case amply demonstrates the danger of making valuable property rights dependent upon what was known or unknown a quarter of a century ago. Furthermore, there was no known vein extending lengthwise of the Lone Pine claim at the time of location, or even at the time of patent. There was nothing on the surface to indicate that the Blacktail vein extended that far to the north, and while vein No. 2 was, perhaps, known at the time of discovery, and was certainly known very soon thereafter, yet that vein, so far as then known, extended crosswise of the claim, and there was not even a suspicion until years afterwards that it turned abruptly to the south, almost at right angles, and crossed the south end line, if, indeed, that fact can be said to be established at this time. If the contention of the plaintiff is correct, the discovery vein on the Lone Pine claim has no extralateral rights. It could not be pursued along the strike or course of the vein beyond the east side line, nor could it be pursued beyond the end lines proper. Yet, had the discovery vein dipped and extended beyond the north end line of the claim, I fail to see how the right of the owner of the claim to pursue the vein on its downward course or dip beyond the end line could be defeated, except by some person showing a prior right. If this is true, why should side

lines or end lines now depend upon the fortuitous circumstance that it has recently been discovered that vein No. 2 in fact crosses the south end line. The locators of the Last Chance claim knew that the discovery vein on the Lone Pine crossed the side lines, and they had a right to assume, therefore, that no extralateral rights would ever be asserted in that direction.

These views seem in entire harmony with all law writers on the subject. Thus, in discussing the different classes of veins within the same surface boundaries, Judge Lindley says:

"One thing seems quite certain: The law, as at present construed, may compel the inquiry, where two veins are found to exist within a claim, as to which one was discovered first—that is, which vein was the basis of the location—and there exists to this extent a distinction between the two classes of veins." Lindley on Mines (3d Ed.) § 594.

Commenting on this statement in the Harvard Law Review, Mr. Henry Arnold says:

"In other words, where two veins are found to apex within the surface territory of one location, no distinction is to be drawn between them, but both are to be treated as of equal dignity—unless a question arises as to some point concerning, or dependent on, the drawing or character of the boundaries of the location, in which event, but in which event only, inquiry as to which is the discovery vein (that is, as to which vein served as the basis of location) becomes of moment." 22 Harvard Law Review, 278.

"Extralateral rights on secondary (incidental) veins—that is, on veins other than the discovery (original or principal) vein—are determined with reference to those lines, which for the discovery (original or principal) vein's extralateral rights are the end lines of the claim." Costigan on Mining Law, p. 440.

"There can be but one set of end lines for all the veins covered by the patent, and where departure from one or both side lines renders it material, only the discovery vein can be used to determine what are the planes of the end lines." Morrison's Mining Rights (15th Ed.) p. 215.

The doctrine of extralateral rights has been the subject of more or less criticism in the past. All the authorities agree that side lines and end lines do not depend on the mere act of the locator, and if it is now held that they do not depend on the course or strike of the discovery vein, another element of uncertainty is introduced, and the administration of the mining laws will become still more vexatious and difficult.

If I am correct in these conclusions, the plaintiff can assert no extralateral rights beyond the east side line of the Lone Pine claim, and it becomes unnecessary to discuss or consider the debatable questions whether a connection between vein No. 2 and the Blacktail vein has been established with the degree of certainty required by law, or whether the plaintiff is seeking to follow or pursue the vein on its course or strike, rather than its downward course or dip. I reach this conclusion with the less hesitation because it leaves both parties in the full possession and enjoyment of all rights claimed by them and their predecessors in interest for more than 20 years after the location of their respective claims.

For the reason stated, the bill of complaint should be dismissed; and it is so ordered. Let a decree be entered accordingly.